**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Daniel CHALAN, Jr.,
Defendant-Appellant.**

**No. 85–2113.**

United States Court of Appeals,
Tenth Circuit.

March 3, 1987.

der in violation of 18 U.S.C. § 1111 (1982 & Supp. III 1985), one count of robbery in violation of 18 U.S.C. § 2111 (1982), and two counts of the use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c) (Supp. III 1985). For the reasons set out below, we reverse in part and remand for further proceedings.

The facts are set out in detail with our discussion of the issues raised by defendant. In summary, the record establishes that on January 28, 1985, a convenience store within the Cochiti Pueblo in New Mexico was robbed. During the robbery, Elizabeth Haskins, the assistant store manager, was shot and bludgeoned to death. In its investigation, the police interviewed three witnesses who had been in the vicinity of the store prior to the robbery. These witnesses indicated that they had seen near the store four young Indian males who appeared to be intoxicated. One witness identified Daniel Chalan, a Cochiti Indian who grew up on the Cochiti Pueblo and lived there at the time of the robbery and murder. The police contacted him and asked him questions about the crimes. The primary evidence used against Chalan at trial was a confession made by him on the day of his arrest, January 30, 1985.

On appeal, Chalan contends that (1) the trial court erred in refusing to suppress certain statements that he made; (2) the trial court failed to inquire adequately into the bases of assertions by prospective defense witnesses of their Fifth Amendment privilege; (3) he was deprived of a fair trial by the Government's refusal to grant use immunity to certain defense witnesses; (4) the trial court erred in excluding certain hearsay statements; (5) the trial court failed to conduct an adequate voir dire; (6) he was denied equal protection of the laws by the Government's use of its peremptory challenges to strike all members of his race from the jury panel; and (7) the court's imposition of consecutive sentences for two violations of 18 U.S.C. § 924(c) violated the Double Jeopardy Clause and was contrary to congressional intent. We reject all but

Tova Indritz, Federal Public Defender (Peter Schoenburg, Asst. Federal Public Defender, with her on the brief), Albuquerque, N.M., for defendant-appellant.

Presiliano Torrez, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., with him on the brief), Albuquerque, N.M., for plaintiff-appellee.

Before BARRETT and SEYMOUR, Circuit Judges and SAM, District Judge.*

SEYMOUR, Circuit Judge.

Daniel Chalan, Jr., was convicted in a jury trial of one count of first degree mur-

---

* Honorable David Sam, District Judge, District of Utah, sitting by designation.

the last two of these contentions. We conclude that Chalan has established a prima facie case of racial discrimination by the Government in its use of its peremptory challenges. We also hold that imposing consecutive sentences for two violations of section 924(c) violated the Double Jeopardy Clause under the circumstances of this case.

## I.

We first address Chalan's contention that the trial court should have excluded from evidence certain statements that he made to the police. On January 29, 1985, federal and local law enforcement officials attempted to contact Chalan to ask him questions about the convenience store robbery. The investigators went to the Cochiti Pueblo Community Center and spoke to the Pueblo Governor. They eventually contacted Chalan through a message conveyed to him by his mother, and asked him to meet them in the Governor's office at the community center. The message to Chalan may also have included a request from the Governor to appear at his office. In response to the message, Chalan arrived at the Governor's office, accompanied by his mother.

At the Governor's office, Chalan was questioned by an FBI agent, two investigators from the Bureau of Indian Affairs, an officer from the local county sheriff's office, the Governor, and Chalan's mother. Some of the officers were visibly armed. The interview was taped, and the officers photographed Chalan for purposes of assembling a photo array. At no time during the interview was Chalan arrested. Nor was he administered any *Miranda* warnings. After approximately one and one-half hours of questioning, the interview ended, and Chalan departed.

During the course of the interview, the investigators asked Chalan numerous questions concerning his knowledge of and possible involvement in the crimes committed at the convenience store. The officers explicitly informed Chalan at the beginning of the interview that he did not have to answer any questions, that he was not a

suspect in the case, and that the officers merely wanted him to provide them with information. But the questioning was often accusatory. The investigators, the Governor, and Chalan's mother exhorted him to tell the truth. Nevertheless, no one threatened Chalan, no one mistreated him physically, and no one forced him to remain at the Governor's office. Throughout the January 29th interview, Chalan consistently denied any participation in the robbery and murder.

On January 30, 1985, after having conversations about the murder and robbery with several of his cousins, Chalan decided to discuss things with the law enforcement officers again. He asked one of his cousins to summon the FBI agent to the cousin's home. When the agent arrived, and before the agent had asked Chalan any questions, Chalan confessed to having committed the crimes. The confession occurred approximately twenty-two and one-half hours after Chalan was questioned on January 29. The agent explained to Chalan his *Miranda* rights. Chalan signed a written waiver-of-rights form and then gave a detailed confession, which was later reduced to writing and signed.

Chalan was twenty-two years old at the time of the investigation. He had been arrested at least twice before. He had also worked for approximately one year as a law enforcement official for the Pueblo. He had graduated from high school and attended college.

At the suppression hearing preceding Chalan's trial, Chalan sought to exclude from evidence both his January 29th and January 30th statements. He argued that his January 29th statements should be excluded because he was subjected to "custodial interrogation" without first being admonished regarding his constitutional rights, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Alternatively, Chalan argued that his January 29th statements were involuntary. Finally, Chalan argued that his January 30th confession was involuntary because he was still operating under the coercion placed on him during the January 29th interview.

The trial court ruled all of Chalan's statements admissible. First, the court held that Chalan was not in custody for purposes of *Miranda* during the January 29th interview. The court specifically found that

"the defendant freely and voluntarily came to the Governor's office. No force or threat of force was used to compel the defendant to come to the office or to stay once he got there. Defendant was free to go at any time. After questioning the defendant was not arrested but was allowed to return home with his mother.

"... [D]efendant cannot point to any specific restraint on his freedom to leave except his wish not to show disrespect toward the Governor or fall into disfavor with the Governor.... Defendant's deference to the office of the Pueblo's Governor does not render the questioning of the defendant custodial."

Rec., vol. 1, at 80–81. The trial court also found that, on January 29th, "[n]o physical or mental pressure, threats or promises were used to coerce defendant into giving a statement." *Id.* at 81. Thus, the court concluded, "[d]efendant's statement was the product of his own free and independent will." *Id.* With regard to the January 30th statements, the trial court found that

"[t]he defendant initiated the contract [sic] with the law enforcement officers and gave a complete narrative of his involvement without prompting by the officers. He stated that he was not threatened in any way.... There is no evidence that the statement was coerced in any way or that the defendant was not completely competent when the statement was made."

*Id.* at 82. Accordingly, the trial court concluded that the January 30th confessions were "voluntarily and freely given." *Id.* Finally, the court ruled that "defendant knowingly, voluntarily and intelligently waived his right to counsel and his right to remain silent." *Id.*

In *Miranda*, the Supreme Court held that, in order to protect the privilege against self-incrimination, law enforcement officers must administer prophylactic warnings regarding the privilege to any suspect subjected to "custodial interrogation." *Id.* at 444, 86 S.Ct. at 612. The Court explained that such interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* If the warnings are not administered, the prosecution may not use statements made by the suspect, "whether exculpatory or inculpatory." *Id.*

Since *Miranda*, the Supreme Court has elaborated on its definition of when a suspect is in custody for purposes of administering *Miranda* warnings. According to the Court, the ultimate inquiry in deciding the custody question "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)). To measure the degree of restraint on the freedom of a suspect's movement, a court must examine "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). The Supreme Court has also held that a suspect is not in custody for purposes of *Miranda* simply because he is the "focus" of an investigation. *See Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976); *see also United States v. Ellison*, 791 F.2d 821, 823 (10th Cir.1986). Nor does the fact that an interview is conducted by law enforcement officers or the fact that "the questioned person is one whom the police suspect" transform an interview into custodial interrogation. *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

■ Chalan claims that during the January 29th interview he was in custody for purposes of *Miranda* and that his statements should therefore have been excluded from evidence. We disagree. In some re-

spects the interview was both coercive and accusatory. Despite those elements, the trial court concluded that defendant could not reasonably have believed that he was in custody during the interview. We are satisfied that the trial court's findings of fact are not clearly erroneous. *See Ellison*, 791 F.2d at 822. No force or threats of force were used to compel defendant's attendance at the interview or to keep him there once he had arrived. Chalan came to the interview voluntarily and was free to leave at any time. The interviewing officers told him that he was not being charged with a crime. We believe that this information, under the circumstances of this interview, would lead a reasonable person to think that he would be free to leave. In fact, Chalan was not arrested on January 29th, and he left the Governor's office when the interview ended.

Defendant claims that his attendance at the interview was compelled because, by tribal custom, he could not refuse a request by the Pueblo Governor to come to his office and was required to remain until dismissed. The Governor is the head of the Pueblo. He presides over the tribal council and is in charge of the Pueblo police force. Evidence presented by Chalan at the suppression hearing suggested that obedience to the Governor is expected of all tribal members. Thus, a tribal member would be expected to appear when summoned by the Governor and to answer any questions asked by the Governor. Although the Governor's actions and status may have influenced Chalan to attend the interview, we are not convinced that this influence sufficiently restrained Chalan's freedom so as to necessitate the safeguards required by *Miranda*. We agree with the trial court that Chalan's desire not to show disrespect toward the Governor does not render the questioning custodial.

Even though defendant's *Miranda* rights were not violated, his statements would nevertheless be inadmissible if they were made involuntarily. For purposes of testing the admissibility of a suspect's statements, voluntariness depends upon an assessment of "the totality of all the surrounding circumstances," including "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *see also Culombe v. Connecticut*, 367 U.S. 568, 606, 81 S.Ct. 1860, 1881, 6 L.Ed.2d 1037 (1961); *United States v. Falcon*, 766 F.2d 1469, 1476 (10th Cir.1985). The ultimate inquiry in determining voluntariness is as follows:

"Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Culombe*, 367 U.S. at 602, 81 S.Ct. at 1879; *see also Schneckloth*, 412 U.S. at 225–26, 93 S.Ct. at 2046–47; *United States v. Fountain*, 776 F.2d 878, 885 (10th Cir. 1985); *United States v. Brown*, 540 F.2d 1048, 1053 (10th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977). In assessing the circumstances that surround a suspect's responses to interrogation, the Supreme Court has looked at a number of factors, including the age, education, and intelligence of the suspect, the length of his detention and the questioning, and the use of physical punishment. *See Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047. In no case, however, is any single factor determinative.

When a defendant claims that his statements to investigators were involuntary and thus improperly admitted at trial, "it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith*, 425 U.S. at 348, 96 S.Ct. at 1617 (dictum) (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966)); *see also Miller v. Fenton*, 474 U.S. 104, ——, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985) (in collateral review cases, "ultimate issue of 'voluntariness' is a legal question requiring independent federal determination"). But the trial court's rulings with regard to subsidiary factual

questions, such as whether the police intimidated or threatened a suspect or whether the suspect was particularly susceptible to police coercion, are subject to review under the clearly erroneous standard. *See Fountain,* 776 F.2d at 879.

■ We conclude, based upon an independent evaluation of the record and with appropriate deference to the trial court's findings of fact, that Chalan's January 29th statements were not involuntary. Several key facts lead us to that conclusion. First, although all those present exhorted him to tell the truth, Chalan was specifically informed at the beginning of the interview that he was not obligated to answer any questions. Second, the interview was not excessively long. *Cf. Ashcraft v. Tennessee,* 322 U.S. 143, 153, 64 S.Ct. 921, 925, 88 L.Ed. 1192 (1944) (defendant held incommunicado for thirty-six hours). Third, the environment in which the interview took place was not unduly coercive. Although some of the officers were armed, Chalan's mother was present and no one physically threatened Chalan in any way. Fourth, Chalan had experience with law enforcement procedures, both as an officer for the Pueblo and as a prior arrestee. In addition, Chalan was not unusually susceptible to coercion because of his age or lack of education or intelligence. Finally, and most importantly, Chalan consistently denied any involvement in the crimes throughout the January 29th interview. We believe this fact in particular indicates that Chalan's free will was not overborne by the questioning.

■ Nor do we consider Chalan's confession on January 30th to have been involuntary. This conclusion, too, is based on several key facts. Almost twenty-four hours elapsed between the end of the questioning on January 29th and the time of Chalan's confession. Chalan had no contact with law enforcement officials during this time period. In addition, Chalan initiated the contact with the investigators on January 30th, and spontaneously confessed to the crimes upon seeing the FBI agent. Finally, before making a detailed confession, Chalan signed a written waiver of his right

to remain silent. *See Fountain,* 776 F.2d at 886 (signing waiver form prior to confession is " 'usually strong proof' of the voluntariness of the waiver"). In sum, we agree with the trial court that the January 30th confession was voluntarily and freely given.

## II.

During a portion of Chalan's January 30th confession, an investigator asked him what he would have done if any one had walked into the convenience store during the robbery. Chalan allegedly responded, "I probably would have shot them also." Rec., vol. VI, at 204. At trial, Chalan attempted to exclude this remark, claiming that it was irrelevant and that admitting it into evidence would unfairly prejudice him. The trial judge ruled the remark admissible:

"I think it's part of the overall [January 30th] statement and puts it in perspective. It is relevant on intent and state of mind and it's relevant [to] the voluntariness and the trustworthiness of the statement...."

Rec., vol. VI, at 3.

■ Fed.R.Evid. 402 states the general rule that "[a]ll relevant evidence is admissible." Under Rule 403, relevant evidence "may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice." Fed.R.Evid. 403 (emphasis added). Unfair prejudice, for purposes of Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note. The mere fact that evidence damages a defendant's case, however, does not constitute unfair prejudice within the meaning of Rule 403. *See Fitzgerald v. United States,* 719 F.2d 1069, 1071 (10th Cir.1983). A trial court has broad discretion to balance the probative value of evidence against its prejudicial impact. *United States v. Atwell,* 766 F.2d 416, 422 (10th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 106 S.Ct. 251, 88 L.Ed.2d 259 (1985).

■ We hold that the trial court did not abuse its discretion in admitting evidence of Chalan's remark. The evidence is clearly relevant to Chalan's state of mind at the time the crimes were committed. In order to convict Chalan for murder, the jury was required to find that he had "an intent at the time of [the] killing, willfully to take the life of a human being, or an intent willfully to act in a callous and wanton disregard of the consequences to human life." Rec., vol. VIII, at 100 (jury charge). Chalan's statement directly relates to this central prerequisite of his conviction. Even if Chalan's statement had some emotional impact on the jury, we cannot say that its probative value was "substantially outweighed" by any unfair prejudice that it may have caused.

### III.

At trial, Chalan subpoenaed his brother, Delmar Chalan, and his cousin, Francis "Huncie" Gordon, as witnesses on his behalf. Both Delmar and Huncie had made statements to an investigator for defendant in which they described the following: their activities on the day of the robbery and murder; the intoxication of defendant on the afternoon of the crimes; the presence of defendant, Huncie, Delmar, and another cousin of defendant, Walter Gordon, near the convenience store shortly before the crimes were committed; and the destruction by Huncie Gordon of a gun that the four men had been using that afternoon.

Both Huncie and Delmar invoked the Fifth Amendment privilege against self-incrimination. Defendant claimed that the Government's attorney had improperly influenced counsel for Huncie and Delmar to advise them not to testify, thereby depriving defendant of two critical witnesses. The trial judge conducted an inquiry and, based upon the statements of all parties involved, found no evidence of prosecutorial misconduct. Chalan then moved for use immunity for both Delmar and Huncie so that they might testify for him. The Government refused to grant the witnesses use immunity, and the trial court ruled that it had no authority to do so itself.

The witnesses invoked the Fifth Amendment in response to the following questions: defense counsel asked Huncie Gordon where he lived at the time of the robbery and murder and whether he had engaged in a beer-drinking game with defendant on the day the crimes were committed; Delmar Chalan was asked whether he was related to defendant and whether Dee Mody—whose father owned one of the guns that may have been used in the crimes—was his girlfriend. After refusing to answer these specific questions, both witnesses asserted a blanket privilege not to testify. The trial court sustained the privileges over defendant's objection and excused both of the witnesses. Defendant contends on appeal that the trial judge failed to conduct an adequate inquiry into the bases for the assertions.

The Fifth Amendment states in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A witness' privilege not to answer incriminating questions has been liberally construed. For example, in *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Supreme Court declared that the privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486, 71 S.Ct. at 818; *see also United States v. Jones*, 703 F.2d 473, 475 (10th Cir.1983). In addition, the claimant should not be required to establish the basis for the privilege "in the sense in which a claim is usually required to be established in court"; otherwise, the witness "would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman*, 341 U.S. at 486, 71 S.Ct. at 818. The Court in *Hoffman* also stated that

"[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the

question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' "

*Id.* at 486–87, 71 S.Ct. at 818 (quoting *Ex parte Irvine,* 74 F. 954, 960 (C.C.S.D. Ohio 1896)). A trial judge should order the witness to answer questions only if it is " '*perfectly clear,* from a careful consideration of all the circumstances in the case, ... that the answer[s] *cannot possibly* ' " tend to incriminate the witness. *Id.* at 488, 71 S.Ct. at 819 (emphasis in original) (quoting *Temple v. Commonwealth,* 75 Va. 892, 898 (1881)); *see also United States v. Nunez,* 668 F.2d 1116, 1121 (10th Cir.1981).

■ We hold that the trial court did not err in granting these witnesses a blanket privilege not to testify. The testimony of both witnesses would have revealed that they were intimately involved with the activities of defendant during the afternoon that the crimes were committed. Their testimonies would have shown that both witnesses were near the convenience store shortly before the crimes occurred. Huncie Gordon's testimony would have shown that he destroyed a weapon that he had used that afternoon. Delmar Chalan's testimony would have revealed an association to the owner of one of the suspected weapons. None of this information would directly support a conviction; at the very least, however, it "furnish[es] a link in the chain of evidence" needed to prosecute the witnesses. *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818. Although neither witness had been charged with a crime at the time of defendant's trial, the trial judge properly did not allow this fact to influence his decision. *See Jones,* 703 F.2d at 478.

■ Chalan also contends that the Government's refusal to grant use immuni-

ty to the two potential witnesses deprived him of a fair trial. In *United States v. Hunter,* 672 F.2d 815 (10th Cir.1982), we held that "courts have no power to independently fashion witness use immunity under the guise of due process." *Id.* at 818. However, we left open the possibility that "where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering acquittal." *Id.* (citing *Government of the Virgin Islands v. Smith,* 615 F.2d 964, 968 (3d Cir.1980)). We need not decide that issue in this case. Although defendant claimed at trial that the Government had improperly influenced Delmar and Huncie not to testify, the trial court held a hearing on the issue and specifically found no prosecutorial misconduct. We are not persuaded to overturn this finding.

## IV.

■ One of defendant's witnesses was the investigator who had interviewed Delmar and Huncie. The trial judge allowed the investigator to testify regarding all aspects of Delmar and Huncie's statements to him except those statements that related to defendant's alleged intoxication on the afternoon of the robbery. Defendant argued that the latter statements should be admitted under Fed.R.Evid. 804(b)(3) as statements against the penal interests of the declarants. According to defendant, the statements tend to show that he was too drunk to commit the crimes and they thus implicate Huncie and Delmar as the more likely perpetrators. The trial judge ruled the statements inadmissible, reasoning that, although information regarding defendant's intoxication might tend to exculpate him, the statements were not sufficiently contrary to the witnesses' penal interests to be admissible under Rule 804(b)(3).[1]

---

1. The trial court also ruled that these same statements were protected by the privilege against self-incrimination. These rulings are not inconsistent. The Fifth Amendment privilege is broad and must be liberally construed:

testimony about drinking with defendant on the afternoon of the crimes would have provided "a link in the chain of evidence" against Delmar and Huncie. *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818. The test under Rule 804(b)(3), on the

Fed.R.Evid. 804(b)(3) provides a hearsay exception for statements against interest:

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Huncie and Delmar were admittedly "unavailable" for purposes of Rule 804(b)(3). *See* Fed.R.Evid. 804(a)(1) (declarant unavailable when granted privilege not to testify). Thus, the only issue is whether their statements about defendant's drunkenness sufficiently implicated them with criminal liability to fall with the Rule 804(b)(3) exception.

We agree with the trial court that the statements were not admissible. The declarations about defendant's drunkenness do not demonstrate that defendant was so drunk that he could not commit the crimes. Even if they did show that defendant was extremely intoxicated, that fact would not necessarily implicate Delmar and Huncie. To be admissible under Rule 804(b)(3), a statement against penal interest must so far tend to subject the declarant to criminal liability "that a reasonable man in his position would not have made the statement unless he believed it to be true." Fed.R. Evid. 804(b)(3). The rule is designed to ensure that no evidence will come within the exception unless it is sufficiently trustworthy. *See id.* advisory committee's note.

The connection between defendant's drunkenness and the declarants' possible involvement in the crimes is too tenuous to ensure that the statements are reliable.

V.

 We next address Chalan's contention that the trial judge failed to conduct an adequate voir dire. During the voir dire, the trial judge asked, among other things, whether any of the veniremen or immediate members of their families had been victims of crimes. One prospective juror responded to the question with information about a friend. Another, Ruben Garcia, told the court that his sister-in-law had been robbed at the convenience store where she worked. The judge next asked whether any of the panel members or their close relatives worked or had worked in a convenience store. Ruben Garcia responded that his girlfriend worked in a convenience store. He also repeated that his sister-in-law had been robbed at the convenience store where she worked. He then added that she quit because she "couldn't take it anymore." Rec., vol. V, at 24. The trial judge did not ask, as requested by Chalan, whether any of the prospective jurors' *friends* worked or had worked in a convenience store. The judge concluded the voir dire by asking the panel whether there was "any reason" why any of them would be unable to decide the case "strictly on the evidence" and with "absolute fairness and impartiality to both sides." Rec., vol. V, at 27.

The settled rule in this circuit is that, "[t]he trial court is vested with wide discretion in the conduct of voir dire, and this discretion should not be disturbed unless there is a clear showing of abuse." *United States v. Lambinus*, 747 F.2d 592, 598 (10th Cir.1984), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); *see also United States v. Hall*, 536 F.2d 313, 324 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976). Chalan

---

other hand, is a narrow one: the statement must so clearly implicate the declarant that a reasonable person "would not have made the statement unless he believed it to be true." Fed. R.Evid. 804(b)(3). Thus, although these state-

ments tended to implicate the witnesses for purposes of the Fifth Amendment privilege, they did not satisfy the more stringent test under Rule 804(b)(3).

argues on appeal that the trial court should have asked the panel members whether they had friends, as well as relatives, who worked in convenience stores. According to Chalan, this was a "potentially volatile" issue, Appellant's Brief-in-Chief at 38, as was demonstrated by the responses about convenience stores by Ruben Garcia.

The trial court did not abuse its discretion in refusing to ask Chalan's proposed question. With regard to at least two of the court's questions concerning relatives, some venire members responded with information about their friends as well. In addition, the court concluded the voir dire by asking the prospective jurors whether there was *"any reason"* why they could not be fair. Rec., vol. V, at 27 (emphasis added). These questions and others sufficiently tested the jurors' impartiality.

## VI.

The original venire for Chalan's trial consisted of thirty-nine prospective jurors. Of those, Mary Lee, A.J. Wanya, and Douglas Williams are American Indians, and Ruben Garcia may be an Indian.[2] The trial court struck Wanya and Garcia for cause. The government exercised two of its peremptory challenges to strike Lee and Williams. Thus, all those of Chalan's race were removed from the panel.

Chalan claimed at trial that the Government's use of its peremptory challenges to strike all of the remaining American Indians from the jury panel violated his right to be tried by an impartial jury. When asked by the court to state its reasons for striking Lee, the Government cited the fact that she might have language problems.

During the voir dire, Lee stated that she understands English "a little bit but not hard words." Rec., vol. V, at 37. With regard to his reasons for striking Williams, the Government's attorney stated that, "based upon his background and other things in his questionnaire, I just elected to strike him."[3] *Id.* at 46.

The trial judge indicated that he would have disqualified Lee for cause if any one had requested him to do so.[4] With regard to the Government's essentially unexplained challenge of Williams, the trial judge stated,

"I think just the striking of one juror in a particular case does not rise to the level of ... a prima facie showing as they set out in *McCray,* whatever they mean by prima facie showing."[5]

Rec., vol. VII, at 7. The court thus rejected Chalan's claim that the jurors were improperly selected.

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court held that a state may not exercise its peremptory jury challenges in a manner that contravenes the Equal Protection Clause of the Fourteenth Amendment. Accordingly, under *Swain,* it was impermissible for the state to exclude members of a cognizable racial group from juries "for reasons wholly unrelated to the outcome of the particular case on trial." *Id.* at 224, 85 S.Ct. at 838. At the same time, the Court recognized the prosecutor's historical privilege of peremptory challenges that could be exercised without stating a reason. *Id.* at 220, 85 S.Ct. at 835. To accomodate this privilege, the Court refused to hold "that the Constitution re-

---

**2.** The record does not conclusively establish that Ruben Garcia is an American Indian. Because Garcia was excused for cause, however, his race does not affect our decision.

**3.** The record does not reveal the contents of the questionnaire.

**4.** In fact, at one point in the proceedings the Government did ask the court to remove Lee for cause, but apparently the Government's request was not adequately communicated.

**5.** The trial court purported to apply the test set out in *McCray v. Abrams,* 750 F.2d 1113 (2d. Cir.1984), *vacated,* —— U.S. ——, 106 S.Ct. 3289,

92 L.Ed.2d 705 (1986). In *McCray,* the Second Circuit held that, in certain circumstances, the use of peremptory challenges to strike jurors of a particular race may violate a defendant's Sixth Amendment right to be tried by an impartial jury drawn from a fair cross-section of the community. 750 F.2d at 1131–32. Because we decide this case according to the equal protection principles recently enunciated in *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), we do not reach the additional question whether Chalan's rights under the Sixth Amendment were violated.

quires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." *Id.* at 222, 85 S.Ct. at 837. Instead, the Court held that a defendant would have to show a pattern of discrimination by the prosecutor over a number of cases in order to establish a prima facie case of racial discrimination. *Id.* at 223, 85 S.Ct. at 837.

*In Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court concluded that *Swain* placed a "crippling burden of proof" on defendants, with the result that "prosecutors' peremptory challenges [were] largely immune from constitutional scrutiny." 106 S.Ct. at 1720–21. The Court reexamined that portion of *Swain* that concerns a defendant's burden of proving a racially discriminatory use of peremptory challenges, concluding "that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 1722–23.

The Court set out a multi-part test to determine whether a defendant has established a prima facie case:

"[T]he defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' ... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."

*Id.* at 1723 (quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)). The Court added that, "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstanc-

es." *Id.* "For example, a 'pattern' of strikes against [minority] jurors" or "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" may provide clues indicating whether the prosecutor has intentionally discriminated. *Id.*

The *Batson* Court then held that "[o]nce the defendant makes a prima facie showing, the burden shifts to the [Government] to come forward with a neutral explanation" for its apparent racially motivated challenges. *Id.* The Court emphasized that

"the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.... But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.... Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in individual selections.'"

*Id.* (citing *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). Instead, the prosecutor "must articulate a neutral explanation related to the particular case to be tried," *id.* at 1723, giving a " 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges," *id.* at 1724 n. 20 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)).

The record demonstrates that there were three, or possibly four, American Indians on the original jury panel. After removals for cause, two Indians remained on the panel. The Government exercised its peremptory challenges to strike both of these jurors, although one of them could have been removed for cause because of her language problems. In effect, then, three of the four Indians were removed for cause, and the last Indian member of the

panel was stricken by the Government through a peremptory challenge.

We hold that, under these circumstances, Chalan has established a prima facie case of intentional discrimination[6] under *Batson.* Chalan satisfies the first portion of the *Batson* test because he is a member of a cognizable racial group, and the Government has stricken members of his race from the jury panel. In our view, the additional fact that the Government used its peremptory challenges to strike the last remaining juror of defendant's race is sufficient to "raise an inference" that the juror was excluded "on account of [his] race," thereby satisfying the final portion of the *Batson* test. *Id.*

■ The striking of a single juror of defendant's race may not always be sufficient to establish a prima facie case. However, using the reasoning as articulated in *Batson* "that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*," *id.* at 1722, we hold this was done in the instant case even though we are here concerned with only a single juror. Our conclusion comports with the notion that peremptory challenges constitute a practice particularly susceptible to racial discrimination. *See id.* at 1723. Such challenges are subject to abuse in part because normally the Government need not state the reasons for its action. If all of the jurors of defendant's race are excluded from the jury, we believe that there is a substantial risk that the Government excluded the jurors because of their race. Our holding helps to avert that risk by requiring the Government to explain the reasons for its challenges when no members of a defendant's race are left on the jury.

■ To rebut the prima facie case of intentional discrimination, the Government must articulate racially neutral reasons for exercising its challenges. The stated reasons must be reasonably specific, and they must be bona fide, *see People v. Hall,* 35 Cal.3d 161, 672 P.2d 854, 858, 197 Cal.Rptr. 71 (1983) (en banc) (reasons proffered by prosecutor for striking blacks were equally applicable to whites not excused; indicates that reasons were not bona fide). The reasons proffered thus far by the Government for its challenge of Douglas Williams are clearly inadequate. *See* rec., vol. V, at 46 ("[B]ased upon his background and other things in his questionnaire, I just elected to strike him."). The record indicates nothing about the contents of his questionnaire and nothing about his background, except that he is an American Indian.

Because Chalan was convicted before the Supreme Court's decision in *Batson,* neither the trial court nor the parties were aware of the standards to be used in evaluating the Government's proffered reasons for striking Williams.[7] Because it is possible that the serious question which remains outstanding could be resolved in favor of the Government at an evidentiary hearing, we do not believe a new trial is mandated at this point. Instead, we vacate Chalan's convictions and remand this case to the trial court for a hearing on the Government's reasons for exercising its peremptory challenge of Douglas Williams. If the trial court is convinced that the Government's reasons satisfy the *Batson* standards, Chalan's convictions must be reinstated. If, however, the Government fails to articulate a reasonably specific and racially neutral explanation for striking Williams, Chalan must be granted a new trial. *See United States v. Winkle,* 722 F.2d 605, 611–12 (10th Cir.1983) (similar procedure applied to attorney conflict-of-interest question).

---

**6.** The equal protection principles of the Fourteenth Amendment are implicit in the Fifth Amendment Due Process Clause and are therefore applicable to the federal government. *See Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) (per curiam) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.")

**7.** The Supreme Court recently decided that *Batson* applies retroactively to all cases pending on direct review. *Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

## VII.

██ Because there is a possibility that Chalan's convictions may be reinstated, we address his contention that a portion of his sentence violates the Double Jeopardy Clause. After his convictions, Chalan was sentenced to life imprisonment for murder committed in the perpetration of a robbery, fifteen years for robbery, five years for using a firearm during the commission of a murder, and five years for using or carrying a firearm during the commission of a robbery. The trial judge first ordered all of the sentences to run concurrently. After the Government objected, arguing that 18 U.S.C. § 924(c)[8] requires consecutive sentences for the firearm convictions, the judge ordered the sentences for robbery and murder to be served concurrently, and the two sentences for firearm offenses to be served consecutively to each other and consecutively to the sentences for robbery and murder. Although Chalan recognizes that one sentence for a firearms conviction is required by the statute to be consecutive to the underlying felony convictions, he contends that requiring the two firearms sentences to be consecutive to each other violates the Double Jeopardy Clause.

Settled Supreme Court doctrine states that "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). Thus, we must discern whether Congress intended by section 924(c) to im-

pose multiple consecutive sentences under circumstances such as those in this case.

Section 924(c) requires the imposition of enhanced penalties on a defendant who uses or carries a firearm during the commission of a "crime of violence." 18 U.S.C. § 924(c). This section, originally enacted in 1968, has always imposed a separate sentence to be served consecutively to any sentence for the underlying offense. In 1978 and 1980, the Supreme Court held that a consecutive sentence could not be imposed under section 924(c) when the underlying offense already contained an enhanced punishment provision that applied in situations in which the offense was committed with a dangerous weapon. *See Busic v. United States*, 446 U.S. 398, 403–12, 100 S.Ct. 1747, 1751–56, 64 L.Ed.2d 381 (1980); *Simpson v. United States*, 435 U.S. 6, 12–13, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978). Both of these decisions were premised on the perceived intent of Congress in enacting section 924(c). *See Busic*, 446 U.S. at 403–08, 100 S.Ct. at 1751–54; *Simpson*, 435 U.S. at 13–16, 98 S.Ct. at 913–15.

In 1984, Congress amended section 924(c), primarily in response to *Simpson* and *Busic*. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 312–14, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3490–92 [hereinafter *Senate Report*]. The section was revised

> "to ensure that all persons who commit Federal crimes of violence, including those crimes set forth in statutes which already provide for enhanced sentences for their commission with a dangerous weapon, receive a mandatory sentence, without the possibility of the sentence being made to run concurrently with that

---

**8.** Section 924(c) provides:

"Whoever, during and in relation to any crime of violence, including a crime of violence which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device, for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence, be sentenced to imprisonment for five years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to impris-

onment for ten years. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein."

for the underlying offense or for any other crime."

*Senate Report, supra,* at 313, 1984 U.S. Code Cong. & Admin.News at 3491. Accordingly, section 924(c) now states that "the term of imprisonment imposed under this subsection·[shall not] run concurrently with any other term of imprisonment including that imposed for the crime of violence in which the firearm was used or carried." 18 U.S.C. § 924(c).

The language of the statute and the Senate Report seem to indicate that a sentence for a violation of section 924(c) should never run concurrently with any other sentence. Chalan argues, however, that Congress did not intend to impose consecutive sentences for two violations of section 924(c) when consecutive sentences may not be imposed for the two underlying offenses. To sustain two convictions under section 924(c), the jury was required to find that Chalan had committed two "crime[s] of violence." *See* 18 U.S.C. § 924(c); rec., vol. I, at 171 (jury charge). The term "crime of violence" is separately defined as "*an offense* that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a) (emphasis added). The two crimes that underlie Chalan's section 924(c) convictions are robbery, 18 U.S.C. § 2111, and "the unlawful killing of a human being with malice aforethought ... committed in the perpetration of ... [a] robbery," 18 U.S.C. § 1111(a).[9] The question is whether Congress intended that these two crimes constitute one offense or two offenses.

In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court devised a test for determining whether two statutory violations constitute two offenses for purposes of the Double Jeopardy Clause. The *Blockburger*

test is also a means of discerning congressional intent that is otherwise uncertain. *See Missouri v. Hunter,* 459 U.S. 359, 367–68, 103 S.Ct. 673, 678–79, 74 L.Ed.2d 535 (1983); *Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1142. According to *Blockburger,* "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182; *see also United States v. Harenberg,* 732 F.2d 1507, 1512 (10th Cir.1984) (applying *Blockburger* ). This test determines both whether a defendant may be sentenced consecutively for two statutory violations and whether a defendant may be successively prosecuted for two violations. *Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).

Under *Blockburger,* first-degree murder and robbery would constitute separate offenses if the first-degree murder conviction were premised on something other than robbery—for example, premeditation or kidnapping. *See United States v. Solomon,* 753 F.2d 1522, 1527–28 (9th Cir.1985) (consecutive sentences for arson and first-degree murder, 18 U.S.C. § 1111(a), do not cause double jeopardy problem when murder charge required finding of premeditation). There is no allegation in Chalan's case, however, that the first-degree murder conviction was based on anything other than the fact that it was committed during a robbery. *See* rec., vol. I, at 1 (indictment); rec., vol. I, at 166 (jury charge). Consequently, all of the facts needed to convict for robbery are also needed to convict for first degree murder. *See Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182; *see also Whalen v. United States,* 445 U.S. 684, 692–93, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980) (applying *Blockburger* test to rape and felony murder convictions under District of Columbia statute analo-

---

9. 18 U.S.C. § 1111(a) provides:

 "Murder is the unlawful killing of a human being with malice aforethought. *Every murder perpetrated by* poison, lying in wait, or any other kind of willful, deliberate, malicious, and *premeditated killing; or committed in the perpetration of,* or attempt to perpetrate, any arson[,] escape, murder, kidnap-

ping, treason, espionage, sabotage,, [sic] rape, burglary, or *robbery;* or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, *is murder in the first degree.*

 Any other murder is murder in the second degree." (Emphasis added).

gous to federal statute here); *Harris v. Oklahoma,* 433 U.S. 682, 682–83, 97 S.Ct. 2912, 2912–13, 53 L.Ed.2d 1054 (1977) (per curiam) (proof of underlying felony of robbery with firearm was prerequisite to defendant's conviction of felony murder; therefore, successive prosecution for underlying felony barred). Under the *Blockburger* analysis, the underlying crimes in this case constitute a single offense for double jeopardy purposes, and a single "crime of violence" within the meaning of section 924(c).

The legislative history of section 924(c) does not undermine this conclusion. Nothing there indicates that Congress foresaw or considered how a court should determine the number of crimes of violence that have occurred in a single criminal transaction. As the court noted in *Simpson* and *Busic,* the legislative history of the original version of section 924(c) was exceedingly sparse. *See Busic,* 446 U.S. at 405, 100 S.Ct. at 1752; *Simpson,* 435 U.S. at 13–14 & n. 7, 98 S.Ct. at 913–14 & n. 7. The section was amended in 1984 specifically to address the problems raised by *Simpson* and *Busic,* and does not speak to the problem before us.

Where the statute and legislative history are not clear, we are governed by the principle of lenity: "[I]f Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses...." *Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *see also United States v. Valentine,* 706 F.2d 282, 292–93 (10th Cir.1983) (citing *Bell*). "When Congress has the will it has no difficulty in expressing it...." *Bell,* 349 U.S. at 83, 75 S.Ct. at 622. Congress had no difficulty in expressing its will that a consecutive sentence be imposed under section 924(c) when the underlying offense contains an enhancement provision. Congress did not clearly express its will regarding how the statute should be applied in a situation such as Chalan's.

In sum, *Blockburger* dictates that Chalan committed only a single "crime of violence" for purposes of double jeopardy.[10] The conviction and sentence on the second section 924(c) charge must be vacated. *See Ball v. United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985).

## VIII.

For the reasons stated in part VI, we vacate the judgment of the trial court and remand for an evidentiary hearing on the Government's reasons for its peremptory challenge of Douglas Williams. If the Government's reasons fail to satisfy the *Batson* standards, defendant must be granted a new trial. If the reasons satisfy *Batson,* defendant's convictions must be reinstated. In the latter event, for the reasons stated in part VII, the court may reinstate only one of the convictions for violating section 924(c). In all other respects, the judgment of the trial court is affirmed.

---

**10.** The Government argues that the firearms convictions and sentences are correct because the evidence indicates that two firearms were used during the crimes. Brief of Appellee at 47. We reject this argument. Although there is evidence that Chalan may have used two firearms during the robbery and murder, the jury did not find, nor was it required to find, that two weapons were used. *See Valentine,* 706 F.2d at 294. Moreover, double jeopardy questions are decid- ed by focusing "on the elements of the crimes" with which the defendant is charged, and not on "the evidence at trial." *United States v. Davis,* 793 F.2d 246, 248 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986). We do not speculate whether proof that Chalan committed the robbery and murder with two separate weapons would be sufficient to permit two convictions and consecutive sentences.