**F I L E D**

**UNITED STATES COURT OF APPEALS**

**December 12, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

GREGORY CARL MINARD,

     Defendant-Appellant.

No. 05-6089
(W.D. Oklahoma)
(D.C. No. 04-CR-97-L)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **McKAY**, and **MURPHY**, Circuit Judges.

**I.    Introduction**

Following indictment on drug and firearm charges, Gregory Carl Minard

moved to suppress inculpatory statements he made to police. The district court

held an evidentiary hearing as required by *Jackson v. Denno*, 378 U.S. 368

(1964), to determine whether Minard's statements were made voluntarily. After

considering evidence presented by both the Government and Minard, the court

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec.
1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

determined the Government carried its burden of showing, in each instance, the knowing and voluntary nature of Minard's Fifth Amendment waiver and incriminating statements. The court denied Minard's suppression motion and ruled the statements admissible at trial.

Minard subsequently pleaded guilty to one count of knowingly manufacturing methamphetamine under 18 U.S.C. § 841(a)(1) and one count of being a felon in possession of firearms under 18 U.S.C. § 922(g)(1).[1] The court sentenced Minard to concurrent prison terms of 240 months on the methamphetamine charge and 120 months on the firearms charge. In his plea agreement, Minard retained the right to appeal the district court's denial of his suppression motion. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's decision.

## II.    Background

Minard was shot in the chest by co-defendant Christopher Spindler on March 27, 2004, following an early morning argument and gun fight at Minard's home in Oklahoma City. Minard was taken to Oklahoma University Medical Center. During his hospital stay, Minard was under arrest on state charges for

---

[1]In exchange for his guilty plea, prosecutors moved to dismiss count 1 of the indictment. Count 1 accused Minard and three others of conspiracy to manufacture, possess with intent to distribute, and distribute 500 grams or more of methamphetamine in violation of 18 U.S.C. § 841(a)(1).

manufacturing methamphetamine. Minard did not have surgery to remove the bullet, but his condition improved during his hospitalization.

A police search of Minard's house immediately after the shooting revealed chemicals and tools used in methamphetamine manufacturing. A .22 caliber pistol belonging to Minard was subsequently recovered inside the house; the .357 caliber revolver Minard used in the shootout was recovered from a co-defendant. The police investigation revealed Minard routinely sold methamphetamine to Spindler and others. Minard ultimately admitted, for sentencing purposes, to manufacturing one kilogram of methamphetamine.

While in the hospital in the days after the shooting, Minard was interviewed twice by police detectives, once on March 30 and again on April 2. In each interview, an Oklahoma City police detective advised Minard of his *Miranda* rights and, in response, Minard waived his rights and agreed to speak with the officers. In the course of these interviews, Minard admitted to manufacturing methamphetamine in his home as well as to owning two guns. Minard was interviewed again a month later, on April 29, at the Oklahoma City jail. In this third interview, after again waiving his *Miranda* rights, he provided additional details about his role in manufacturing and selling methamphetamine and about the shooting incident. None of these conversations was recorded or transcribed. Minard does not, however, contest the substance of the conversations

Detectives Park and Chute recounted to the court. Minard only claims the waivers and statements he gave were unknowing and involuntary.

At the hearing on Minard's motion to suppress, the district court heard testimony from Nurse Heather Ross, the nurse on duty during the first of the interviews, to establish Minard's medical condition at the time of that first interview. The court also received into evidence Minard's hospital records (Government Exhibits 3–5) and the waiver forms he signed (Government Exhibits 1 and 2). Detective Kenneth Park testified about Minard's demeanor and the substance of his statements during the hospital interviews. Attempting to counter Park's testimony, Minard's mother, Barbara Lynch, testified about Minard's confused mental state and dire physical condition during her visits to the hospital. Detective Allen Chute testified about the nature and substance of the jailhouse interview.

Considering the evidence before it, the district court determined "the government has carried its burden of showing by the preponderance of the evidence that Minard's waiver of rights and subsequent confessions were knowingly and voluntarily made." The court denied Minard's motion to suppress. The court found no evidence of police coercion at either the hospital or the jail, and, despite Minard's injury and receipt of pain medication, rejected Minard's argument that pain or painkillers affected Minard's free will.

On appeal, Minard claims the district court incorrectly concluded his statements were voluntary and, therefore, erroneously failed to suppress the statements. This court concludes Minard's assertions on appeal are unavailing.

## III.  Discussion

Minard challenges both the validity of his *Miranda* waiver and the voluntariness of the statements he gave after providing a waiver. A *Miranda* waiver, to be valid, must be given voluntarily, knowingly, and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An inculpatory statement, to be admissible, must be made voluntarily and of the defendant's free will. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Involuntariness in the context of both *Miranda* waivers and confessions requires a finding of coercive police action. *Id.* ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."); *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he relinquishment of the [*Miranda*] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Thus, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary.

A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing

and intelligent. 384 U.S. at 444. In contrast to a voluntariness analysis, a court need not find coercion in order to find a defendant's waiver unknowing or unintelligent. *See United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002). Instead, the totality of the circumstances must demonstrate a defendant waived his rights with a "requisite level of comprehension." *Moran*, 475 U.S. at 421. A waiver is knowing and intelligent only if it was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* A defendant need not, however, understand all the consequences of the waiver. *See Colorado v. Spring*, 479 U.S. 564, 574 (1987). He need only understand his right to remain silent or have his statements used against him. *Id.*

When a defendant challenges the validity of a *Miranda* waiver or the voluntariness of his inculpatory statements, this court independently reviews the entire record and decides *de novo* whether the defendant's actions and words were voluntary. *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). This court accepts the district court's findings of fact, however, unless the findings are clearly erroneous. *Id.* Examples of factual findings in the voluntariness context include the district court's determinations about police intimidation of a suspect or the suspect's susceptibility to police coercion. *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987). With these standards in

mind, we consider separately each of Minard's three interviews with law enforcement.

## A.    March 30 ICU Interview

Minard argues he was under the influence of painkillers and in great pain during the March 30 hospital interview.  Although he listened to Detective Park read the waiver of rights form, read the form himself, and signed the form, he contends he was confused and did not understand the nature of the legal rights he was waiving.  Minard, therefore, argues his statements were involuntary and his waiver was invalid.

Unless clearly erroneous, this court must accept the district court's factual findings.  Based on a transcript of the district court's evidentiary hearing and the exhibits received by the district court, we conclude the district court properly found an absence of evidence of police coercion and properly determined Minard's waiver and inculpatory statements were voluntarily made.

Park interviewed Minard in the surgical trauma ICU just after 1:00 p.m. on March 30, 2004, three and a half days after Minard was admitted to the hospital.  Park asked Nurse Ross for permission to interview Minard.  Park also asked Ross whether Minard was under the influence of mind-altering drugs or painkillers and whether he would be able to answer Park's questions.  Although she did not check Minard's chart before answering Park's questions, Ross indicated Minard was not under the influence of drugs and would be able to respond to Park's inquiries.

Once inside Minard's room, Park roused Minard from sleep and allowed Minard time to drink a sip of water and orient himself. Park said he read Minard a standard waiver of rights form word for word, made sure Minard could read English, and allowed Minard the thirty seconds to a minute he needed to read the form over for himself. Park estimated he was seated in a chair about a foot and a half to two feet from the side of Minard's bed during this time. Minard signed the document while lying down in bed. Minard also verbally stated his willingness to talk to Park. The entire interview lasted twenty minutes.

Hospitalization and pain alone are not enough to create any sort of presumption of coercion or involuntariness. *See United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002) (rejecting gunshot victim's claim of FBI coercion where FBI took care in determining whether victim's medical condition would impair his ability to answer questions); *United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (concluding statements made two days after gunshot wound to defendant's mouth while defendant was still in pain were voluntary). Despite Minard's attempt to equate his situation with that in *Mincey v. Arizona*, 437 U.S. 385, 389–402 (1978), his situation is easily distinguishable from *Mincey*: Minard's interrogation took place three days after being shot; Minard signed a waiver and indicated great willingness to speak with Detective Park; Minard did not complain of pain to Park; Minard had a chest tube and IV inserted at the time of the interview but was not otherwise encumbered by medical apparatus; Minard

had not received painkillers or other mind-altering drugs in the eighteen hours prior to the interview; Minard did not indicate confusion about any subject on which Park questioned him. There are no indicia of police coercion in this encounter. Therefore, Minard's waiver could not have been involuntary even if his decision to talk were influenced by pain medication or pain level. *See Connelly*, 479 U.S. at 167.

Additionally, this court concludes, based on facts found by the district court, that Minard's mental state, pain medication level, and pain intensity level did not negate his ability to knowingly or intelligently waive his rights. The evidence presented to the district court shows that Minard, a thirty-seven year old man with an eleventh grade education and several prior felony convictions, had no difficulty understanding the waiver and its implications.

Regarding Minard's mental state, Nurse Ross testified about the neurological assessment used to rate a patient's verbal, motor, and neurological responses. On March 30 Ross rated Minard's verbal response as five or "oriented" at 7:00 a.m. and again at 3:00 p.m., but rated Minard a four or "confused" at 11:00 a.m., two hours before Detective Park's visit. Minard's records also showed he had been rated a five or "oriented" at each other four hour interval on March 29 and 30 before and after the 11:00 a.m. "confused" rating.[2]

---

[2]Nurse Ross explained that "confused" means the patient is oriented to at least person, place, or time, but not all three; it can also mean the patient is

In addition to medical testimony from Nurse Ross, Detective Park testified about Minard's mental acuity and condition on March 30 by describing the substance of their conversation. Park estimated he had interviewed close to a thousand people during his career as a police officer and, based on his experience, Minard showed no signs of difficulty understanding Park's questions. In particular, Park said Minard was able to discuss manufacturing methamphetamine using the red phosphorous method, provided the name of the person who taught him to cook methamphetamine, and told Park where in Minard's house Park would find particular items used to manufacture methamphetamine. Park was able to corroborate both the location of the items Minard mentioned and information Minard provided about the two other people with whom Minard shared the house.

Barbara Lynch, Minard's mother, attempted to demonstrate Minard's mental confusion on March 29 and 30, but the district court determined her testimony was insufficient to temper Ross' and Park's testimony and the information contained in Minard's medical records. Lynch testified Minard drifted off during her visits to the hospital and, upon reawakening, was surprised to see her. She also said Minard did not remember from one day to the next that

---

sleeping. Ross also noted Minard opened his eyes spontaneously and responded to her commands at 11:00 a.m. and that, at 1:00 p.m. when Park arrived, Minard's vital signs were stable.

she had visited him the day before and mistakenly thought his daughter had visited him in the hospital. On cross examination, however, Lynch admitted Minard was not "incoherent, it was just that he would be kind of dazed." Lynch also had difficulty remembering the dates of her visits and whether Minard exhibited confusion on March 29, the day before his interview with Detective Park, or on March 30.

On the issue of pain medication, prior to Detective Park's visit, Minard had last received four milligrams of morphine intravenously at 8:48 p.m. on the evening of March 29, nearly eighteen hours before the interview with Detective Park. Nurse Ross testified every administration of morphine is noted on a patient's chart and confirmed Minard did not have the ability to administer morphine to himself. Nurse Ross testified that, although pain medication affects different patients differently, four milligrams of morphine usually lasts four to five hours. There was no evidence Minard received other mind-altering drugs on March 29 or 30.

In terms of Minard's pain level, Nurse Ross testified about Minard's self-reports of pain. At 7:00 a.m. on March 30, before the interview, Minard had no complaint of pain. When he complained of pain at 2:14 p.m., after the interview, he rated his pain as a seven on a one-to-ten scale. Detective Park testified Minard may have appeared to be in a bit of discomfort when he adjusted his position in bed, but there were no indications of extreme pain.

-11-

Based on the evidence noted herein and other evidence in the record, we conclude Minard's mental and physical condition did not impair his ability to voluntarily, knowingly, or intelligently waive his Fifth Amendment rights. Additionally, because we conclude there was no police coercion at any point during the March 30 encounter, this court affirms the district court's determination that Minard's subsequent statements to police were voluntary and given freely. *See United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998) ("[I]t is clear after *Connelly* that a confession is only involuntary . . . if the police use coercive activity to undermine the suspect's ability to exercise his free will."). The district court properly denied Minard's suppression motion as the motion related to the March 30 interview.

**B.    April 2 Hospital Room Interview**

According to Detective Park's uncontroverted testimony, Park returned to the hospital on April 2, 2004 with Detective Allen Chute to question Minard about the shooting. Minard had been moved to a standard hospital room. Park checked with a nurse prior to entering Minard's room. Unlike the earlier visit, Minard was awake when Park and Chute entered the room and was "extremely cognizant" and "fully aware" from the beginning of the interview. Although Park did not have a waiver form for Minard to sign on this visit, Park read Minard his *Miranda* rights from a card; Minard said, "Yeah, I'll talk with you." Minard then told the detectives about the shooting incident, including admitting his ownership of the

.357 caliber gun used to fire at Christopher Spindler. Minard also told Park about the .22 caliber pistol located under an ottoman in the living room. This interview lasted approximately ten to fifteen minutes.

Minard does not seriously challenge the waiver or statements he made in this interview as involuntary. Rather, he alleges they should be suppressed as fruit of the allegedly illegal earlier interview. Because this court has determined the legality of the earlier interview, there is no constitutional problem with the April 2 interview.

## C.    April 29 Jailhouse Interview

Minard's challenge to his third police interview alleges Detective Chute and Special Agent Whitney created a coercive environment by discussing the possibility that Minard had cancer. Minard contends the conversation so unsettled him that his *Miranda* waiver was invalid and his statements were involuntary. Upon a review of the evidence presented to the district court, this court agrees with the district court's assessment that the record is devoid of evidence to support Minard's position.

Detective Chute testified he recalled hearing early in the investigation that Minard possibly had cancer. He remembered *asking* Minard about this at the beginning of the interview, but denied *telling* Minard he had cancer. Chute said Minard responded to the officers' inquiry by saying he did not have cancer. Agent

-13-

Whitney then read Minard his *Miranda* rights from a standard ATF waiver form,[3] which Minard then read for himself and signed. Chute testified neither he nor Whitney made promises to Minard in exchange for his willingness to talk to them.

Other than conclusory arguments in Minard's brief, there is no indication that Minard's decision to talk with Chute and Whitney on April 29 was influenced by the cancer discussion. Chute testified the entire interview lasted twenty-five to thirty minutes. He thought Minard seemed comfortable, aware, and cognizant of his surroundings during the interview. Minard told Chute and Whitney about the shooting and the chase and gun fight that preceded it, admitted again that he used a .357 caliber gun to fire at Christopher Spindler, and told Chute where to look for the .357 Wesson if detectives couldn't find the gun in his house. Minard also told the officers about his methamphetamine use: he indicated he manufactured methamphetamine mostly for his own use but also sold it to pay his bills and rent. He estimated he manufactured approximately two to three ounces per week from Christmas 2003 to March 2004 and sold it at $900 per ounce.

Although this court questions the officers' rationale for mentioning cancer to Minard at all, the officers' conduct does not amount to "coercive activity to undermine the suspect's ability to exercise his free will." *United States v. Lugo*,

---

[3]Although it is unclear from the record whether this cancer discussion occurred prior to or after Minard signed a waiver form, Minard's counsel at oral argument said the discussion happened first.

170 F.3d 996, 1004 (10th Cir. 1999). As the district court correctly determined, there is no evidence to suggest Minard's will was overborne or to indicate his inculpatory statements were made involuntarily. Additionally, there is no suggestion Minard's waiver was not knowing or intelligent. This court therefore concludes Minard's waiver was valid and his statements were voluntary.

## IV. Conclusion

This court **affirms** the district court's denial of Minard's suppression motion.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge