**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James AUSTIN, Defendant–Appellant.**

**No. 90–3145.**

United States Court of Appeals,
Tenth Circuit.

May 13, 1991.

---

834

Mark W. Works, Works, Works & Works, Topeka, Kan., for defendant-appellant.

Tanya J. Treadway, Asst. U.S. Atty. (Lee Thompson, U.S. Atty., with her on the brief), for plaintiff-appellee.

Before SEYMOUR and BALDOCK, Circuit Judges, and CHRISTENSEN,* District Judge.

CHRISTENSEN, Senior District Judge.

Defendant-appellant James Austin was convicted in the district court by verdict of a jury on a one-count indictment for resisting three correctional officers at the United States Penitentiary, Leavenworth, Kansas, in violation of 18 U.S.C. § 111, with reference to 18 U.S.C. § 1114. He seeks reversal on the contentions that the district court erred in overruling his motion to suppress a statement elicited from him by an FBI agent in violation of the Miranda rule, excluding from the jury evidence of his mental illness, and giving instructions at variance with the indictment. Having concluded that one of these claims to the prejudice of the defendant has been sufficiently made out, we reverse.

It was contended on behalf of the defendant throughout the proceedings that at the time of the alleged offense, as well as when his pretrial statement was given, he was mentally ill. His motion to suppress was denied and the agent later gave trial testimony concerning the statement.

Defendant's counsel as required by Fed. R.Crim.P. 12.2(a) for such purpose gave notice of intent to rely upon the defense of insanity. The government moved pursuant to 18 U.S.C. § 4241 for a hearing to determine the mental capacity of the defendant

---

* Honorable A. Sherman Christensen, Senior Judge, United States District Court for the District of Utah, sitting by designation.

to stand trial and requested the court to order a psychiatric examination pursuant to 18 U.S.C. § 4247(b) and (c). The court so ordered and added that the report from the Medical Center for Federal Prisoners should include also "an examination as to whether the defendant was insane at the time of the offense charged." Upon receipt of the report of examination and after hearing the court ruled that the defendant was competent to stand trial.

Counsel for the defendant moved for an independent psychiatrist's examination, submitting that "intent to commit a crime under mental defect" would be a trial issue, that without such help he could not present "a defense of mens rea or diminished mental capacity," and that the defendant was without funds to secure an expert. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and *Cartwright v. Maynard,* 802 F.2d 1203 (10th Cir.1986), were cited in support of this request, which was summarily denied by the district court and trial was set to begin within a week.

The defendant was found guilty by the jury and the court sentenced him to eighteen months' imprisonment to follow the unexpired term of another sentence and to the payment of fifty dollars for the crime victims' fund. Represented by his trial attorney, he has timely appealed to this court.

## I

The day following the assault, a special agent for the Federal Bureau of Investigation interviewed the defendant. After being read a Miranda warning from the usual advice of rights form, he said he understood his rights and would talk to the agent without an attorney being present. He refused, however, to sign a written waiver form.

In the course of the thirty-minute interview, the defendant in substance stated that he was mentally ill—a paranoid/schizophrenic; that when officers came to his cell to let out another prisoner he himself wanted to get out; that he had had a problem with two of the people in the cell; that when the door was opened he pushed against an officer and ended up struggling on the floor; that he recalled hitting an officer but did not recall biting anyone and that he did recall blows being exchanged.

Defendant's counsel moved to suppress this statement on the ground that there was no valid consent as the defendant was mentally ill within the contemplation of *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966). At the hearing on the motion the agent testified to the above-mentioned statement and its circumstances, adding that because he thought what Austin was "going after" was that "I done this [and] I did this because I'm a nut case," he asked Dr. Thomas White, the prison psychologist, to look at Austin. Without objection the witness was permitted to testify that "he [Dr. White] did not conclude that he was suffering from mental illness according to that memo." Tr. of suppression hearing at 14–15. There was no evidence of any coercion, pressure or other overreaching directed against the defendant in connection with the interview, nor did the defendant offer any other evidence at the suppression hearing.

The court denied defendant's motion to suppress, stating: "There's nothing before this court, in all the examinations that we've had of this defendant or anything else, that would give the court a basis for finding that he was incompetent at any time during or after the incident in question or during the investigation of this case." Tr. of suppression hearing at 15–16.

■ We review factual findings of the trial court on the motion to suppress under the clearly erroneous rule, with a *de novo* eye to the ultimate legal question of voluntariness. *See United States v. Chalan,* 812 F.2d 1302, 1307–08 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988).

■ Upon the record before the district court at that time, we cannot say that there was not substantial evidence of a compe-

tent, knowing and voluntary waiver of defendant's Miranda rights nor that the ruling was contrary to law.

## II

In addition to the testimony of the FBI agent repeated at the trial concerning defendant's pretrial statement, the following summary of the other trial testimony about defendant's conduct will provide helpful context for our discussion of the admissibility of medical reports offered on his behalf and rejected by the trial court, as well as any prejudicial effect of such rejection.

A correctional officer not involved in the scuffle testified that he heard a noise and looked down the range about sixty feet and saw two other officers attempting to restrain Austin, although at the time he couldn't identify any of the participants. "It appeared that the officer was trying to restrain the inmate and the inmate was resisting.... Just struggling. He was on the floor and the officers were trying to hold him down." At no time did he see the officers strike at the inmate and did not see "who threw the first punch or push anyone." Tr. Vol. Two at 13–15.

Corrections officer Charles Nance testified that he had just returned another inmate to the cell and had completed taking off his handcuffs when he heard a scuffle behind him and saw that Officers Luongo and Woodward had Austin on the floor in a prone position and were attempting to apply hand restraints and the witness then lent assistance. At that time Austin was on the floor and had both hands under his body. When he attempted to remove one of Austin's hands from behind his back, the witness testified Austin hit him. He believed Austin was trying to kick Officer Luongo. The latter and Officer Woodward were trying to remove Austin's other hand from behind his body to get the handcuffs on. The affair according to Nance lasted two or three minutes. At the time they were transporting Austin to a security cell, the witness testified he heard Austin say at least two times that "he was crazy and was not responsible for his actions." Tr. Vol. Two at 19–23.

Officer James Luongo testified that following a prior change of cells because of Austin's complaints, he had been moved to the cell in which the difficulty occurred and had complained about two fellow inmates there; that as he was removing one of these other inmates to take him to the law library and was putting Austin's bedding inside the cell from his former cell, he was unable to close the door because Austin's body was blocking the doorway; that Austin "started scratching" at Officer Woodward's neck and they "took inmate Austin to the floor [and] there was a scuffle and a wrestling match on there."

> Well, he proceeded—we proceeded to the floor where we was trying to control the arms and his legs. He was kicking me and he was finishing (sic) me right at the back with his one leg.... He was still scratching and throwing punches at Officer Woodward when we went to the floor with him.... I had hooked his leg with my leg in order to take him down on the floor.... He bit me on my right index finger because I had his hand pressed down on the floor next to his head ... in order to, I guess, try to release his hand.

Officer Luongo testified that Austin wrote him a letter after his release from segregation. The letter was entitled "Peace, Peace, Peace, Peace," and in it Austin asked "the good Lord to bless [Luongo]." Tr. Vol. Two at 30–37.

Officer Woodward, the third of the three who entered the cell, having left his employment at the prison, did not testify.

Austin testified on his own behalf. He understood he was in prison "for [e]xtortion, frightened—threatened others." After discursive references to his troubles at the institution, he testified at length about his version of the occurrence in question of which the following is a sample of the nearest he came to a coherent account:

Q. Could you tell me in your own words what exactly happened with the officers involved?

A. When they played the cell routine with me two days in a row, on the 15th of June, '87, which was on a Monday—I was housed on the second floor in the

special housing unit—they carried me down on the first floor. They talked with a case manager by the name of Kevin Pardo. After I finished talking with him they locked me up on the first floor, and the place they carried me back upstairs on the second floor, they locked me up on the first floor in the cell with two other inmates.

. . . .

So then Officer James Howard Luongo takes and brings me my property. He had everything tied up in a sheet in a big bundle. So he has to—he took—he opened the door and handed it to me. So I say, "Look here, I like you to take me back upstairs." He closed the door and walked away. So I took my property and just sit it on my bed.

About 20 minutes later he come back and let this inmate out to make a phone call. I don't recall his name. So when he did, I just grabbed my property and walked out. I didn't run. I walked at a moderate pace, and him—and he had officer James Woodward with him, and they—as I was coming—stepping out the cell they slammed the door on me, trapping me between the cell door and the wall.

I managed to come on out on the range with my bundle of property in my hands. They grabbed me, wrestle me down, and I don't know which one it was, but one of them—it was either Luongo or Woodward—they was calling Officer Nance. They called Officer Nance.

And three of them they wrestled me down, and when they did, my bundle of property was on top of me in my midsection, my solar plexus area, because there was a large big bundle tied up in a sheet. So now they wrestle me down and put cuffs on me on the floor like—they're talking about I'm hitting them when I was on the floor and kicking them. No, no, I did not do that. They're making that up. And they saying that just to make me look bad and trying to make themselves look good.

. . . .

Q. Mr. Austin, you testified basically that you tried to act in self-defense. Is that correct?

A. Yeah, if you want to call it that, but I didn't throw no punches at them. I had my property in my hand—see what I'm saying—and it was a big bundle tied up in a sheet. I grabbed my property and just walked on out as—you know, as the doors unlocked.

Tr.Vol. Two at 49–50, 53–54, 56.

Austin testified that he had been dropped on his head by his mother when he was young and confined to mental institutions on nine different occasions, the first being at Lima State Hospital in Lima, Ohio, returning there on several different occasions which he dated with apparent precision: "Okay? That's the four times I was housed at the mental institution in Lima, Ohio." He then similarly specified the four times he said he was at the psychiatric unit of the Springfield Medical Center and said he had also been in the psychiatric unit of the federal institution at Butler, North Carolina. Tr.Vol. Two at 56–58.

Defendant's counsel offered in evidence exhibits 404, 405, 407 and 408, containing medical reports of some of these state hospitalizations.[1]

1. Exhibit 404, the report of the prison psychologist dated April 5, 1978. While the report discusses the possibility that the "patient may be consciously exaggerating or malingering" as an alternative to his being acutely disturbed, the psychological finding was that there was the apparent presence of a psychotic process as well as some clinical indication of brain damage and the diagnosis referred to "evidence of an active psychotic process that would be known and attributed as [sic] Chronic Organic Brain Syndrome, with Psychosis."

Exhibit 405 is a psychiatric report from Dr. Lewis A. Lindner, M.D., of an examination on March 2, 1978. This report contained the following observations, among others: "The patient manifested klang, florid, paranoid delusions.... is clearly mentally ill, and due to that illness, dangerous to himself and others.... IMPRESSION: (1) Paranoid Schizophrenia.... Borderline Mental Retardation.... PROGNOSIS: Poor, due to chronicity."

Exhibit 407 is a psychologist's report and is the earliest of the proposed exhibits being dated January 27, 1976. It describes his condition as "placid," likely due to medication of 100 mg. of Thorazine twice a day. The psychologist's opinion was that the patient was "of borderline

Counsel for the government objected to the tendered exhibits on the grounds of remoteness and that they lacked probative value on the issue of whether or not the defendant at the time of the offense on June 16, 1987, was able to appreciate the wrongfulness of his acts and because the reports were prepared by doctors and medical people not present with foundation established for their admissibility. The trial judge overruled the objections grounded on lack of foundation, recognizing that the indigent defendant had no means of getting the doctors present in court and that it would be "total error" to rule them out "based on that lapse." But, observing that the most recent report tendered was at least eight years before the alleged offense and ten years earlier than the trial, he sustained the government's objection on the sole ground of remoteness because the reports were "not probative on what his condition was in 1987," adding: "However, it's not on the foundation, not on hearsay, it's based on the fact that they're prehistoric as far as this crime is concerned, and that will be the ruling of the Court." Tr. Vol. Two at 60–65.

On cross-examination, counsel for the government developed its apparent theory that Austin's claim of mental illness was a pretense to avoid the rigors of ordinary prison life.

Q. If you have mental problems that require some sort of psychiatric care, whatever, you're given a lesser custody institution, you're given other benefits, are you not, if, in fact, that's the case?

A. Not—I don't quite understand or know what you're getting at.

Q. Well, if you're a—if you actually need mental—a doctor's counseling, let me put it that way, psychiatric care, you wouldn't be housed at Leavenworth, they would send you to another institution, wouldn't they?

A. You got to try to understand this here. I'm trying to bear with you. Okay? Now, these staff members—now, I'm not, you know, trying to change the subject or nothing like that. Like I say, I'm trying to bear with you. These staff members, Kurt, when an inmate arrive at the institution, the only thing they looked at in the inmates record is why they were sent to the penitentiary. See? See what I'm saying? Why the—okay. Like I say, I'm trying to bear with you.

Q. The fact is, Mr. Austin, that you did this because you thought it would benefit you, didn't you, trying to exit the cell? You would get out of that cell and you wouldn't be in that cell anymore, right, on June 16th?

A. What it was, Kurt, hey, I didn't like the idea of the staff member playing the cell routine. I feel they had some type of trick up their sleeves. See what I'm saying? That's the reason why I left there.

Q. Okay, because you didn't like it. Right? That was your decision. You didn't like it so you were going to change it. Right?

A. Well, like I said now, Kurt, I didn't belong in there in the first place. I wasn't trying to change nothing.

Q. It was kind of like back in the Ohio system that your attorney mentioned where you wrote a threatening letter to either the president or Ex–President Carter at that time, you did that, too, because you thought it would benefit you, didn't you? You'd get into court and you could get off your medication. It's the same sort of thing, isn't it, Mr. Austin? Your actions on June 16 were taken because you thought you would benefit from it. Isn't that right?

A. No, no. No, no. Inasmuch as I was on medication when I did this here, and on top of that, I couldn't have been in my

mentally defective intelligence and that he is not brain damaged nor psychotic." The report concludes, nonetheless, that until the patient can prove himself able to adjust to rules and regulations at the Lima State Hospital, "the patient could be considered mentally ill because of his current unmanageability."

Exhibit 408, being a report of an examination by Dr. Lindner dated September 19, 1979, reported after reciting more moderate symptoms "IMPRESSION: (1) Paranoid Schizophrenia (DSM II 295.3), in partial remission. PROGNOSIS: (1) Poor, due to chronicity."

right frame of mind. See what I'm saying?

Q. And if you're not in your right frame of mind, then you get to transfer to Springfield again, don't you?

A. Kurt, try to understand this here. Tr.Vol. Two at 78–80.

Having been prevented from getting before the jury his earlier medical records while in state custody, although the government without foundation brought in the "Ohio system" in the above-quoted extract from its cross-examination of the defendant, the defendant was unable to fully explore more recent reports concerning his mental condition.

THE COURT: Do you have anything further?

. . . .

MR. WORKS [counsel for defendant]: Yes, Judge. I would like to call Mr. Schnake to introduce some medical—Mr. Austin's medical record.

THE COURT: Very well.

. . . .

(THEREUPON, the following proceedings were had at the bench:).

MR. SHERNUK: The witness they're going to call is a custodian of records from Leavenworth Penitentiary who has the entire medical file—Federal medical file of this defendant. I don't know what Mr. Works intends to offer here, but certainly the entire file is not relevant to this matter. If he has specific documents he wants to enter, then let's talk about specific documents, but I think the entire file is way out of line here, and certainly it has a lot of irrelevant information. And I'm not sure what is in that is relevant, that's number one.

Number two, while this witness may be the custodian of the records, he didn't prepare these. The doctors are available and were available to be subpoenaed. In fact, Doctor White is going to testify here, who is the Chief Psychologist at the Leavenworth Penitentiary, so he is the Government's rebuttal witness. Those are the proper people to testify about the contents of those reports and not the reports themselves. I can't cross-examine a report, Judge.

THE COURT: All right. Tell us what you have in mind.

MR. WORKS: Judge, maybe—the only thing I understand is that he can't testify to what's in the records. All he can testify to is they are genuine and authentic. I think it's—the important thing is to let the jury examine the medical record. I don't see any reason to exclude it. It's important to the defense of mental illness here.

The medical record does reflect—the first document I used in the file indicated that his paranoid schizophrenic was an admission, but also diagnosed him as having a antisocial personality. I think that's always important to the issue of the intent in this case, Judge, that—Mr. Austin's mental status at the time of the accident. There are records in there that are very recent. There are also some notes that may be helpful to the jury to determine what his status is—or was in 1987.

THE COURT: You're actually offering the entire file with his sick calls and everything like that?

MR. WORKS: Yes, Your Honor. If you want me to dig some documents out for—

THE COURT: I don't think you can put the whole file in. I [It] would only be confusing to the jury and would have nothing to do with the issues in this case. If you've got something as to how he was treated at the time of the incident or what his situation was at that time, that's something else. But just a general record is not admissible as I see it.

Unless you can give me some other reason, I don't think there's any basis for just putting a blanket medical file into the record. I think that would be very confusing to the jury. I would stir up an issue that's not even here, as I see it. So, consequently, objection sustained. You may proffer—we'll accept it as a proffer, but its admission is denied, so there is no need to call the witness.

MR. WORKS: Thank you, Your Honor.

THE COURT: All right.

Tr.Vol. Three at 101–04.

The government called on rebuttal Dr. Thomas W. White, Chief Psychologist at the Leavenworth Penitentiary, who conceded that many of the things the defendant did were somewhat bizarre or unusual, but was permitted over the objection of defendant's counsel to broadly relate Austin's situation to his observations of the general prison population:

Q. You did note in your report, did you not, that the defendant sometimes acted—his behavior was sometimes bizarre?

A. Yeah. Many of the things that he did or does are unusual that you wouldn't consider normal, quote/unquote, but that doesn't necessarily imply, then, that he's mentally ill. I think that he's in control of those behaviors, and many of those behaviors are really just immature reactions to frustrations, and et cetera, but not necessarily mental illness.

Q. Based upon your training and experience, do people sometimes claim to have a mental illness when they may not?

A. Oh, sure.

Q. Why? Especially within the prison setting, Why?

A. Well, there are a number of—

MR. WORKS: Judge, I object. Who are we talking about here? Are we talking about Mr. Austin or just the general population of the prison?

THE COURT: Objection overruled. Do you understand the question?

DOCTOR WHITE: Sure.

THE COURT: You may answer.

I think there are a number of reasons why individuals might want to do that. Number 1, in some cases by trying to present yourself as mentally ill, it can lessen the impact of disciplinary proceedings if you had been charged with something. Many people view being in a mental hospital, such as Springfield or something, as less aversive as remaining in Leavenworth.

In addition to that, there is often a benefit for an inmate, if other inmates view him as unstable or unpredictable, that it allows him to be left alone by other inmates in the population, and that can have an advantage for many individuals.

And it also in some cases just serves as a way for individuals to have a reputation that they might not be able to get some other way.

Q. Does it offer also the opportunity for recognition that might not otherwise be attainable for an inmate?

A. Yeah, it can. It's some way to be known.

Tr.Vol. Three at 112–13.

During the cross-examination of Dr. White, counsel for the defendant attempted, but only fragmentally succeeded, in getting into the record portions of the prison file concerning defendant's mental condition:

Q. Doctor, you have in your possession the central medical file from Mr. Austin. Is that correct?

A. Right.

Q. Can you just read—I mean you indicated—is that what you reviewed in preparation of your—

A. I cannot tell you specifically if, when I wrote the memo, I looked at this or not, although it is quite likely that over the course of dealing with him [the defendant] I may have reviewed it, yes.

Q. More likely or not you reviewed it? The Court: Say that he has. Go ahead and ask your questions.

Q. Doctor, did you make any notations in the file as to what that first page indicated?

A. Not in here, no.

Q. What does that first page indicate?

A. Well, what you're looking at here is an inpatient record which was from Springfield, dated 11–17–87 which is just basically kind of a discharge summary of what they felt about him at the time.

Q. What would those diagnoses have been?

A. They have here schizophrenia paranoid type in remission and Axis I and Axis II antisocial personality disorder.

Q. Do you know the last time Mr. Austin was on medication?

A. No, I don't. I mean, I'm sure if we went through this that I could determine it.

The Court: I'm not going to allow you to have him examine that record. You asked about that one question, and he's answered it. Now, if there is another question specifically, I think we're going to have to stay within some rules here. These are not his records, they're just records that belong to the defendant [sic].

Counsel for Defendant: That's all I have, Judge.

Tr.Vol. Three at 116–20.

As debatable as they may have been, insanity and the related absence of criminal intent were virtually the only defenses interposed on behalf of the defendant and available to him. The lay witnesses for the government, as well as the defendant himself, as we have seen, presented testimony of bizarre conduct and statements compatible with opposing inferences: At the time of the alleged offense the defendant was suffering from mental illness that affected his conduct, or that he feigned mental illness to secure custodial treatment more agreeable to him.

This case is perplexing because other rulings of the trial court resulting in a strikingly disparate situation with reference to expert psychiatric or psychological support have not been preserved for review or assigned as error on this appeal.

But the refusal of the trial court to receive in evidence exhibits numbered 404, 405, 407 and 408 has been assigned and vigorously argued on this appeal upon a record below making clear that their exclusion was on the ground solely of remoteness. Whether that ruling was proper and, if not, whether it was prejudicial to the rights and interests of the defendant in the light of the totality of circumstances reviewed here is squarely before us.

■ We review the trial court's exclusion of evidence under the abuse of discretion standard of review. *United States v. Eufracio–Torres*, 890 F.2d 266, 272 (10th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990).

■ But in making such judgment in present circumstances, we must be mindful of due process implications. The Supreme Court has long recognized that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake*, 470 U.S. at 76, 105 S.Ct. at 1092. This principle is grounded in part on the Fourteenth Amendment's due process guarantee. It is especially pertinent when, added to poverty, the disability of a defendant may include mental illness and is highlighted by the importance of psychiatric assistance in preparing a defense based on insanity. As to the latter, psychiatric assistance may well be crucial. *See Ake*, 470 U.S. at 79–80, 105 S.Ct. at 1094–1095.

In *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir.1985), importantly guided by the doctrine of *Ake*, we said

it is evident when an indigent accused makes a clear showing to the trial judge that his mental condition will be a significant factor at trial, the judge has a clear duty upon request to appoint a psychiatric expert to assist in the defense of the case. That duty cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence. The essential benefit of having an expert in the first place is denied the defendant when the services of the doctor must be shared with the prosecution. In this case, the benefit sought was not only the testimony of a psychiatrist to present the defendant's side of the case, but also the assistance of an expert to interpret the findings of an expert witness and to aid in the preparation of his cross-examination. Without that assistance, the defendant was deprived of the fair trial due process demands. *United States v.*

*Bass*, 477 F.2d 723 (9th Cir.1973). The judgment of the district court is reversed and the case remanded for a new trial.

Long before *Ake*, we were similarly sensitive to corresponding considerations relating to proof of mental illness. We have recognized that generally when insanity is an issue all evidence of mental difficulties either before, after, or on the date of the alleged offense is admissible. *Davis v. United States*, 364 F.2d 572, 574 (10th Cir. 1966); *cf. United States v. Bennett*, 539 F.2d 45, 52–53 (10th Cir.), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

In this context, we have never placed a temporal limit on relevant proof of mental illness and are unwilling to do so now in view of its frequently long duration, its possible chronicity as suggested by the tendered exhibits and its recurrent manifestations within the common knowledge.

In upholding the exclusion of psychiatric testimony where a competency defense had been disaffirmed, we yet expressed concern:

> While the exclusion of proof which touches on competency causes concern, we feel there was no reversible error. In connection with a competency issue the general rule is that the trial court should freely admit all evidence which appears to be relevant, as then Judge Blackmun cautioned. See *Pope v. United States*, 372 F.2d 710, 736 (8th Cir.[1967]), vacated and remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 [(1968)], see also *Wion v. United States*, 325 F.2d 420, 430 (10th Cir. [1963]), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 [(1964)]. However, as noted defense counsel here had disclaimed a competency defense and offered proof on the theory of explanation by the scientist as to defendant's state of mind and intent in the circumstances. This is the theory recognized in *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 that expert proof may be admitted as tending to show, in a responsible way, that the accused did not have the specific

mental state required for a particular crime or degree of crime.

*Bennett*, 539 F.2d at 52–53.

Our other decisions relied upon by the government to justify the exclusion of the reports in question here are clearly distinguishable from the present case.

The government argues that even should it be assumed that the trial court abused its discretion, "this abuse of discretion did not cause the defendant to suffer any prejudice worthy of reversal and a new trial." Br. at 13. We do not agree.

In addition to the important interests of the defendant and the government, we must consider also that of our system of justice. *See Ake*, 470 U.S. at 77, 105 S.Ct. at 1093. To take away the little residual of professional support that remained to him in the excluded reports supporting his theory of defense could be deemed not of less but of greater prejudice than if the other possible assistance from professional opinion had been made available to the defendant in the course of trial.

We recognize both the wide latitude of a trial judge's discretion to exclude evidence that is only marginally relevant and the traditional reluctance of reviewing courts to impose constitutional restraints on ordinary evidential rulings. Yet, we are also mindful of the teaching of *Major Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986), that the exclusion of evidence concerning the mental condition of an accused under some circumstances may become so pervasive as to impinge upon the constitutional right to due process.

Concerned about the latter problem on the record as a whole, but short of any such broad inquiry here, we hold that the exclusion of proffered exhibits numbered 404, 405, 407 and 408 on the ground of remoteness constituted an abuse of discretion prejudicial to the rights of the defendant.

## III

Appellant's final contention that variance between the language of the indictment

and the jury instructions constituted prejudicial error need detain us little longer. Considering the issue as one of law reviewable *de novo*, we find this contention without merit.[2]

■ The statute foundational to the indictment, 18 U.S.C. § 111, provides in the disjunctive that whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title [and the officers referred to in the indictment were so designated] while engaged in or on account of the performance of his official duties" is guilty of the offense charged. The indictment alleged in the conjunctive that the defendant did all of these things.

During jury deliberations the foreman sent the following inquiry to the judge (with another not relevant here): "Instruction # 2 [quoting the statute] states an 'and' statement. However, instruction # 7 states an Or statement. Which is correct? Under section 111(a)(1)—law or indictment —."

The court answered the inquiry by informing the jury: "You should determine the case on the basis of instruction 7" [stating the proscribed methods by which the offense could be committed in the disjunctive.] The law is clear that such submission to the jury was proper, no fatal variance being involved. *United States v. Miller*, 471 U.S. 130, 135–38, 105 S.Ct. 1811, 1814–16, 85 L.Ed.2d 99 (1985); *United States v. Parrish*, 925 F.2d 1293 (10th Cir.1991), quoting *United States v. Gunter*, 546 F.2d 861, 868–69 (10th Cir.1976), *cert. denied* 430 U.S. 947, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977), and 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977): "A crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive."

To some jurors the unexplained difference between the conjunctive and disjunctive statements might be confusing. The court in response to the jury's question appropriately and accurately resolved any possibility of misunderstanding.

For the reasons before stated, we reverse the judgment of the district court and remand for further proceedings.

---

**2.** Arguments made in defendant's brief suggesting also the *per se* invalidity of the indictment for related and other reason are frivolous and warrant no further comment.