956 F.2d 279
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Billy Gene HARRIS, Defendant-Appellant.
 No. 90-5028.
 United States Court of Appeals, Tenth Circuit.
 Feb. 21, 1992.
 
 Before STEPHEN H. ANDERSON and EBEL, Circuit Judges, and ANDERSON,* District Judge.
 ORDER AND JUDGMENT**
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Billy Gene Harris appeals his conviction on two counts of first degree murder in violation of 18 U.S.C. § 1111; 18 U.S.C. § 2; and 18 U.S.C. § 1152. He contends that the district court erred (1) by allowing Harris to be prosecuted under 18 U.S.C. § 1153; (2) by failing to suppress four statements of confession that Harris argues he made involuntarily; and (3) by improperly imposing a restitution order without considering Harris' financial resources or earning ability in violation of 18 U.S.C. § 3664. He also alleges that the prosecutor made improper and prejudicial remarks during closing argument which deprived him of a fair trial. We affirm the conviction, but vacate the order of restitution and remand for a reconsideration of that issue.
 
 I. BACKGROUND
 
 2
 Harris was convicted after a jury trial on two counts of first degree murder for the deaths of Joseph Edward Buck Cheshewalla and Gloria Maude Cheshewalla in Osage County, Oklahoma. The Cheshewallas were members of the Osage Indian tribe and were murdered on an Osage Indian allotment.
 
 
 3
 As a result of information given by an accomplice, and evidence developed from that information, Osage County Deputy Sheriff Bill Williams sought and obtained a search warrant for Harris' residence. Williams and approximately ten other officers went to the Harris house where they encountered Harris. According to Deputy Williams, he asked Harris to get into his police car, advised him of his rights, and told Harris that he had been investigating the robbery-homicides near Pawhuska, Oklahoma, and that he had been in contact with Harris' co-defendant Eugene Sides.
 
 
 4
 He asked if Harris knew Sides, and Harris said that he did. The sheriff told Harris that Sides had "rolled over" on him, that he wanted to hear what Harris had to say, and that he wanted to know if Harris was going to let Sides put the whole thing off on him. Harris responded by saying "I'm fucked anyway" and stated that "it was not supposed to happen like it did, nobody was supposed to get hurt." R.Vol. VII at 108-09.
 
 
 5
 After the exchange, one of the officers came out of the house and said he had found a stolen hand gun from an unrelated burglary. Deputy Williams then placed Harris under arrest and had him transported to the Sheriff's office. Other than stating that he had been investigating the robbery homicides near Pawhuska, and that his accomplice, Sides, had "rolled over" on him, Williams did not explicitly tell Harris that he was suspected of murder.
 
 
 6
 The search of Harris' home and his incriminating statement to Deputy Sheriff Williams occurred between approximately 7:30 and 8:30 a.m. on Friday, May 19, 1989. At approximately 9:25 a.m., on that same date, after having been transported to the sheriff's office, Harris signed a form acknowledging and waiving his rights and then had a lengthy discussion with sheriff's officers on his involvement with the Cheshewalla case. At approximately 10:30 a.m. on that same date, Deputy Williams began a tape recorded interrogation which lasted approximately two hours. In the course of the interrogation, Harris agreed with the officers that he had been arrested that morning for being a felon in possession of a firearm that had been found in his house. He also fully implicated himself in the robbery of the Cheshewallas, but did not admit to participating in their murders.
 
 
 7
 At 4:15 p.m. that same afternoon, while still in custody, Harris signed another waiver of rights form and a consent form for a search of his residence. At 5:30 p.m. he signed yet another consent to search form.
 
 
 8
 A third statement was taken from Harris the following Monday morning, May 22, 1989, after he had been in custody over the weekend and after he had been in the sheriff's office that morning for about two hours. During that two hour period Harris reviewed a transcript of the tape recorded statement he gave on Friday, May 19, and made several corrections. Thereafter, he executed a further statement, which was handwritten, and in which he confessed to having directly participated in the murders of the Cheshewallas. After Harris made the written confession, he made some further statements to the officers present. Notes of the additional statements, recorded by Deputy Bruce Marlin, reflected further details of the sequence of events leading up to and including the shooting of the Cheshewallas. The written notes were signed by Deputy Williams, Deputy Marlin, and Harris.
 
 
 9
 Prior to the written confession given by Harris on Monday morning, May 22, 1989, a written waiver of rights was given to and signed by Harris. In that waiver, Harris acknowledged that his statements were made voluntarily. The same acknowledgment preceded the confession given by Harris on Friday, May 19.
 
 
 10
 One of the waiver of rights forms signed by Harris contained a notation that Harris had completed the eleventh grade and could read and write. The record also shows that Harris was an adult, approximately 45 years of age, and that he had had extensive previous experience with the criminal justice system.
 
 
 11
 The record does not conclusively show when Harris was first taken before a magistrate following his arrest on Friday morning, May 19, 1989. However, the government does not dispute Harris' assertion that he was not taken before a magistrate until after giving the last of his incriminating statements on Monday, May 22, 1989.
 
 
 12
 Harris filed a pretrial motion to suppress the four incriminating statements referred to above on the ground, among others, that they were involuntary. After a hearing at which testimony and other evidence was received, the district court denied the motion to suppress, and the statements were subsequently admitted into evidence at trial. At the conclusion of the suppression hearing, the court found that all of the statements given by Harris were made voluntarily. The court subsequently signed an order including findings, among other things, that there was "no clear and convincing evidence of any promises being made to the defendant concerning leniency and no coercive methods employed by the questioning officers." R.Vol. I, Tab 82, at 5.
 
 
 13
 At trial, the prosecutor made certain comments during his closing arguments to the jury which Harris claims to have been improper and prejudicial. Each of those comments is described and discussed separately below. Following deliberations, the jury returned a verdict of guilty of first degree murder on both counts charged. On January 30, 1990, Harris was sentenced pursuant to the Federal Sentencing Guidelines to concurrent terms of life imprisonment without the possibility of parole. Restitution in the amount of $11,190.00 was also imposed.
 
 II. Prosecution under 18 U.S.C. § 1153
 
 14
 Harris contends that the evidence was insufficient to prove a violation of 18 U.S.C. § 1153. The indictment charged Harris with committing murder in violation of Title 18 U.S.C. §§ 1153, 1111, and § 2. Together, §§ 1153 and 1111 confer federal jurisdiction over the offense of murder committed by any Indian. However, Harris is a non-Indian while the victims, Buck and Maude Cheshewalla, were Indians. The indictment, therefore, should have charged a violation of § 1152, not § 1153. Under § 1152, the murder of an Indian by a non-Indian in "Indian country" is an offense within the exclusive jurisdiction of the United States. United States v. John, 587 F.2d 683, 686 (5th Cir.1979).
 
 
 15
 A similar situation was addressed in United States v. Heath, 509 F.2d 16 (9th Cir.1974). In that case, the Ninth Circuit held that the indictment, although incorrectly charging a violation of § 1153, was sufficient to allege federal jurisdiction under § 1152. The court stated:
 
 
 16
 It is clear, however, that appellant was fully apprised of the charge against her. The indictment set forth the elements of the offense necessary for a conviction under either § 1152 or § 1153. Her own counsel elicited testimony to the effect that Teeman Heath [the victim] was a Miami Springs, Indian. It is inconceivable that appellant would have presented any different defense to the charge of murder had she been indicted under § 1152 instead of § 1153. The error in the indictment was harmless beyond a reasonable doubt.
 
 
 17
 Id. at 20 (citing Henry v. United States, 432 F.2d 114 (9th Cir.1970) (indictment which made reference to § 1152 was sufficient to sustain a conviction under § 1153)); see also St. Cloud v. United States, 702 F.Supp. 1456, 1457 n. 3 (D.S.D.1988) (failure of indictment to cite § 13 was not prejudicial error where indictment gave sufficient notice of the charged offenses and jurisdiction theory).
 
 
 18
 Similarly, here, Harris was fully apprised of the murder charge against him, and of the alleged facts upon which federal jurisdiction was conferred. The indictment charged that the victims were each Osage Indians, and that the murders had been committed on an Osage Indian allotment. The government established at trial that the alleged murders occurred within Indian country as required under § 1152. R.Vol. VI at 4-5.
 
 
 19
 At no time did Harris challenge the sufficiency of the indictment, nor the basis for the exercise of federal jurisdiction. It is inconceivable that Harris' defense would have been any different had the indictment charged a violation of § 1152 instead of § 1153. We also note that Harris did not pursue this contention either in his reply brief or at oral argument. We conclude that the jurisdictional error in the indictment was harmless beyond a reasonable doubt. See Heath, 509 F.2d at 20.
 
 III. The Admissibility of Harris' Confessions
 
 20
 Harris argues that the government did not meet its burden in this case of proving that the four incriminating statements which he gave--two on Friday, May 19, 1989 and two on Monday, May 22, 1989--were the product of his essentially free and unconstrained choice. Appellant's Opening Br. at 26. Harris argues that this is particularly the case with respect to the statements made on Monday, May 22, after he had been in custody for more than three days without first having been brought before a magistrate. Harris further argues that the government failed to meet its burden of proving voluntariness because the district court failed to consider all of the factors set out in 18 U.S.C. § 3501(b), to wit: (1) the time elapsing between arrest and arraignment if the statement was made before arraignment, (2) whether the defendant knew the nature of the offense with which he was charged or of which he was suspected at the time he made the statement, (3) whether the defendant was advised or knew that he was not required to make any statement and that any statement made could be used against him, (4) whether the defendant was advised prior to questioning of his right to counsel, and (5) whether the defendant was without the assistance of counsel when questioned. Id.
 
 
 21
 Specifically, Harris contends that the district court did not consider the length of time between his arrest and arraignment, whether Harris knew before questioning that he was suspected of murder, and that Harris was without the assistance of counsel during questioning. Appellant's Opening Br. at 23-24, 26. Harris contends that the most significant of these alleged errors is the court's failure to consider the first factor just mentioned, i.e., the length of time between his arrest and his arraignment. Id..
 
 
 22
 For additional proof that he acted against his will, Harris also touches on his belief that he was promised lenient treatment if he would cooperate, id. at 19, 21. However, government witnesses denied having made any promises, and the court made a finding that no promises were made. Harris does not seriously pursue the subject in his briefs. Finally, Harris notes that his interrogation sessions lasted for up to three hours, id. at 25, but he does not develop this point either in his opening or reply brief.
 
 
 23
 Although he does not specifically so state, Harris' involuntariness argument appears to be based first on the ground that his statements were not voluntary and were, therefore, admitted into evidence in violation of the Due Process Clause of the Fifth Amendment; and, second, on the ground that the district court violated 18 U.S.C. § 3501 by failing to consider the five factors set out in § 3501(b) (set forth above) and, perhaps, that the lapse of time between arrest and the third and fourth confessions rendered those confessions involuntary under § 3501(c). In any event, it is clear from Harris' briefs that his main emphasis is on the passage of time between his arrest and confessions, during which he was in custody and was not brought before a magistrate.
 
 
 24
 It is settled law that voluntariness is established by the totality of the circumstances surrounding the confession. Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246 (1991). See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Culombe v. Connecticut, 367 U.S. 568, 606 (1961); United States v. Chalan, 812 F.2d 1302, 1307 (10th Cir.1987). The ultimate inquiry is as follows:
 
 
 25
 Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.
 
 
 26
 Culombe, 367 U.S. at 602 (citation omitted). See also United States v. Chalan, 812 F.2d at 1307.
 
 
 27
 Courts consider a number of factors in assessing whether a confession is the product of free will including: the age, education, and intelligence of the suspect; the length of his detention and questioning; the use of physical punishment; whether Miranda warnings were given; the accused's physical and mental characteristics; and the location of the questioning. Chalan, 812 F.2d at 1307-08. In addition, the court must review the conduct of law enforcement officials who allegedly created the pressure and the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 398-402 (1978). The district court must also consider the five factors listed in 18 U.S.C. § 3501(b) (1988).[1]
 
 
 28
 Of all the factors referred to, the conduct of the police, Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986), the capacity of the suspect to resist pressure to confess, and whether the suspect's right to remain silent and to have counsel were communicated to and understood by the suspect are particularly important. See, e.g., United States v. Casal, 915 F.2d 1225, 1228 (8th Cir.1990) ("district court must consider all the circumstances surrounding the giving of the confession, including the [§ 3501(b) ] factors" in determining the voluntariness of a confession).
 
 
 29
 In considering the issue of voluntariness, we review the district court's findings of fact under the clearly erroneous standard, United States v. Lux, 905 F.2d 1379, 1382 (10th Cir.1990), with the evidence viewed in the light most favorable to the government. United States v. Falcon, 766 F.2d 1469, 1476 (10th Cir.1985). We examine the ultimate legal question of voluntariness de novo, upon an examination of the entire record. United States v. Austin, 933 F.2d 833, 835 (10th Cir.1991) (citing United States v. Chalan, 812 F.2d 1302, 1307 (10th Cir.1987)).
 
 
 30
 Applying the foregoing principles, we conclude that the district court did not err in its finding that there were no promises of leniency made to Harris, and that law enforcement officers did not employ coercive methods to extract the confessions. We further conclude, upon an examination of the entire record, that the four incriminating statements given by Harris were given voluntarily, that their admission did not violate the Due Process Clause of the Fifth Amendment, and that the district court did not violate the requirements of § 3501. Accordingly, the district court did not err in its denial of Harris' motion to suppress.
 
 
 31
 Our conclusion is based upon the following reasons, among others. First, not only is there no evidence of any coercion applied to Harris, it affirmatively appears that coercion was entirely absent. It is significant that in his briefs Harris points to no testimony at the suppression hearing or any particularized fact allegations by him before the district court alleging intimidation or pressure of any kind. Furthermore, as the district court found, Harris was not enticed to make his confessions, either by promises or otherwise. R.Vol. I, Tab 82, at 5. See Colorado v. Connelly, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause...."). Second, Harris was repeatedly given Miranda warnings and signed written waivers of his rights. See United States v. Fountain, 776 F.2d 878, 886 (10th Cir.1985) (signing waiver form prior to confession is " 'usually strong proof' of the voluntariness of the waiver") (citation omitted); Chalan, 812 F.2d at 1308 (defendant signed a written waiver of his right to remain silent prior to making a detailed confession). Furthermore, Harris affirmatively stated in his confessions that his statements were being made voluntarily, and at the suppression hearing he acknowledged on cross-examination that the confession given on May 22, had been voluntary. See Appellant's Opening Br. at 21. Harris further evidenced a cooperative and voluntary attitude on Monday, May 22, by making changes to the transcript of his statement given the previous Friday, prior to signing the statement. Third, Harris exhibited no signs of physical or emotional distress during the time he made his incriminating statements or at any time proximate thereto. Fourth, Harris was a mature adult of at least average intelligence and comprehension, who could read and write, and who was not shown to be under the influence of any drug, intoxicating beverage, or medication; and the statements were taken during the day, with no evidence of unduly prolonged periods of questioning, questioning in marathon sessions, throughout the night, or under circumstances where Harris had been deprived of sleep or food. Fifth, Harris was thoroughly familiar with the criminal justice process, including arrest and custody.
 
 
 32
 As our enumeration of the several factors above indicates, we are not persuaded by Harris' argument that the passage of time between arrest and confession, standing alone, renders a confession involuntary per se. No case has so held in connection with a due process analysis, and § 3501(b) which refers to the lapse of time between arrest and arraignment if the incriminating statement was made before arraignment, explicitly provides that: "The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession." 18 U.S.C. § 3501(b). See United States v. Shoemaker, 542 F.2d 561, 563 (10th Cir.1976) (factors of § 3501(b) are not conclusive). Furthermore, the facts of this case do not indicate that delay had any undue impact upon Harris' volition. In that connection Harris points out in his opening brief, Appellant's Opening Br. at 21, that while he admitted on cross-examination that the confession he gave on Monday, May 22 was voluntary, he testified on redirect that he still believed he was going to get the benefit of a promise for cooperating. There is nothing in that testimony which refers to the lapse of time between his arrest and confession as having any bearing on Harris' will. All of Harris' arguments on this point are made technically and in the abstract, with no direct evidence whatsoever tying the lapse of time to Harris' state of mind at the time he made his confessions.[2]
 
 
 33
 The scattering of other § 3501(b) factors which Harris has attempted to engraft upon his lapse of time argument--lack of knowledge of the nature of the offense with which he was charged, the absence of counsel during questioning, and the fact that the interrogation session on Friday morning lasted approximately three hours and the one on Monday morning lasted between two and three hours--in no way counterbalances all of the factors in this record showing that Harris acted of his own free will when he made the statements in question.
 
 
 34
 United States v. Wilson, 838 F.2d 1081 (9th Cir.1988), relied upon by Harris, does not support a different conclusion. In that case, the Ninth Circuit focused almost entirely upon delay within the context of § 3501(c), and the conduct of federal officers. Although the court did undertake a due process analysis which also focused on delay, it did not go so far as to announce a per se rule that delay beyond six hours renders confessions involuntary. "The fact that unreasonable delay, alone, beyond six hours may support a finding of involuntariness suggests that unreasonable delay is the most important factor of all." Id. at 1086 (emphasis added). Furthermore, the court noted in that case that the defendant did not confess until FBI agents applied "skillful psychological techniques," and stated that the facts of the case were suggestive of coercion. Id.[3]
 
 
 35
 Finally, we are unpersuaded by Harris' arguments that the district court failed to consider three of the five factors listed in § 3501(b) because the court failed to make any finding with respect to those factors. Appellant's Opening Br. at 23; Appellant's Reply Br. at 6. In making that contention Harris states that he "does not argue that the district court should be reversed because of a failure to make formal findings as to a statutory factor that the court clearly considered." Appellant's Reply Br. at 5. Rather, he argues that the district court in fact failed to consider the statutory factor of delay, as well as, apparently, the other two factors mentioned--absence of counsel during questioning, and lack of knowledge of the charge. The fact of the matter, however, is that all of these factors were clearly in front of the district court at the time of the suppression hearing. The confessions were dated, the fact of custody from May 19 to May 22 was evident, as was the lack of presence of an attorney, the length of questioning, and other factors mentioned by Harris. When facts are before a district court it is impossible to conclude that the court did not consider them. To the contrary, the presumption is that the court considered all of the facts before it. And, we carry that presumption into our evaluation of the court's conclusion that Harris' statements were made voluntarily. In any event, all of the facts are before us in our de novo review of the entire record.
 
 
 36
 In sum, we agree with the district court that the statements made by Harris were voluntarily and freely given, and the district court did not err in denying Harris' motion to suppress on these grounds.
 
 IV. Prosecutorial Misconduct
 
 37
 Harris' next allegation of error is that the prosecutor made improper and prejudicial remarks during closing argument that jeopardized Harris' right to receive a fair trial. Our standard of review differs depending upon whether the party that alleges harm made a timely objection to the challenged remark.
 
 A. Statements Where No Objection Was Lodged
 
 38
 To preserve an alleged error for appeal, a party must make a timely and proper objection. United States v. Lonedog, 929 F.2d 568, 570 (10th Cir.1991). If the party fails to object, the court will only reverse for plain error. Id.; United States v. Young, 470 U.S. 1, 16 (1985); Fed.R.Crim.P. 52(b). " 'Plain error is "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." ' " Lonedog, at 570 (citations omitted). We address the four statements Harris presents for review under the plain error standard since they were not objected to at trial.[4]
 
 1. Attack on Defense Counsel
 
 39
 At the beginning of closing argument, the prosecutor commented:
 
 
 40
 I want to stress to you, in fact, that what I say has to do with the evidence and not my view of the evidence. I'm not permitted to tell you what I think about the case. Defense counsel has that privilege. He can tell you what he thinks about anything if he wants to. But I say that I'm talking about the evidence in the case, and if you remember it differently, you use your recollection and not what I say about it. I would not try to mislead you in any way. After all, the evidence in this case speaks with great force and should be far more persuasive than anything I could say to you.
 
 
 41
 R. 3rd Supp. Vol. XIII at 26. Harris contends that the jury interpreted this statement to mean that prosecutors were required to confine their remarks to the evidence in the case while defense attorneys were free to disregard the evidence and mislead the jury. Appellant's Reply Brief at 12. While we believe it was error for the prosecutor to make what the government itself describes as a "misinformed" comment, it was not plain error to do so. Under the plain error standard, we view the claim against the entire record. Young, 470 U.S. at 16. While inappropriate, the prosecutor's statement did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice", id. at 16, because we are satisfied that the jury in this case convicted Harris on the basis of the substantial evidence admissable against him.
 
 2. Prosecutor's View of Defendant's Guilt
 
 42
 The next allegation of error concerns another statement the prosecutor made in the opening phase of his closing argument:
 
 
 43
 Who was holding that gun and does it really make any difference? There were just two shooters up there. Here's one of them sitting over here. The other one was Sides. Of course, this man wants you to think Sides fired the first round into Buck and the first round into Maudie. That's what he wants you to think. Some cockamany theory that I was shooting dead people. Is that what he's getting at when he says he fired the second round? And what difference does that make? That's what I anticipate you're going to be hearing. R. 3rd Supp. Vol. XIII at 29. The prosecutor's reference to the defense's "cockamany theory" was unnecessary and probably inappropriate. However, for the reasons stated above in section III A.1., we find that this statement survives a plain error review.
 
 3. Prosecutor's Personal Opinion
 
 44
 Harris' next allegation of error concerns the alleged improper assertion of the prosecutor's personal view of the evidence during the prosecution's rebuttal. Towards the beginning of the rebuttal, the prosecutor commented, "[o]f all the preposterous and outlandish remarks that I ever heard in my life, asking you to return a verdict of not guilty on Bill Harris just about leads that list." R. 3rd Supp. Vol. XIII at 61-2. A prosecutor violates a defendant's due process rights when he expresses his opinion, without qualification, that the accused is guilty of the crime charged. United States v. Ainesworth, 716 F.2d 769, 771 (10th Cir.1983). While the practice is not to be condoned, due process is not offended if the prosecutor states that his belief is based on the evidence in the case. Id. While the prosecutor did not preface his remarks by a reference to the evidence in the case, he mentioned almost immediately the fifty-one pieces of evidence on the government's exhibit list which the government believed linked Harris with the crimes charged. R. 3rd Supp. Vol. XIII at 62. While inappropriate, the comment at issue here did not violate Harris' due process rights and does not constitute plain error.
 
 4. Prosecutor's Inflammatory Remarks
 
 45
 The final statement Harris challenges, for which no objection was raised below, concerns allegedly inflammatory remarks in the prosecutor's rebuttal. The prosecutor stated:
 
 
 46
 Defense counsel is high on the rights that we have in this country. We all are. How many times was Buck Cheshewalla advised of his rights? Now, Mr. Cheshewalla, you have the right not to be shot in the head. And Maude Cheshewalla, you have the right for us not to rob you and shoot you. Were they told that? Of course not.... This case does not require a lot of Fourth of July oratory, and I beg your pardon for raising my voice, but I sometimes run a little bit short of patience with defense attorneys.... Maudie and Buck were dead when he shot them. How does he know that since he's not a nuclear scientist? How would you and I know that? They probably thought James Brady was dead when he was shot in the head up there in Washington when he was with President Reagan. You remember that? Didn't we see him on television the other night? He wasn't dead when he was shot in the head.... Those bodies were still pumping blood. Those people's hearts were working. Their minds were working apparently. You've got a right to consider that. You don't have to believe the first shot killed either one of them. But to believe his preposterous theory that Bill Harris knew that they were dead so he just went up and shot them. Well, if he knew they were dead, why did he shoot them? You have a right to consider that also.
 
 
 47
 R. 3rd Supp. Vol. XIII at 63-4. We have previously stated that "[m]ethods designed to arouse prejudice, passion, and use of invective are not proper argument." United States v. Coppola, 479 F.2d 1153, 1163 (10th Cir.1973). Again, however, like the three statements analyzed above, this comment does not warrant a reversal under a plain error review.
 
 B. Statements Objected To Below
 
 48
 A different standard applies to claims of prosecutorial misconduct to which Harris raised a timely objection at trial. This court must determine whether the conduct was, in fact, improper, and, if it is, we proceed to determine whether that misconduct warrants reversal. Lonedog, 929 F.2d at 572 (citing United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir.1988)). The prosecutorial misconduct does not warrant reversal if it was harmless error. Id. (citing United States v. Alexander, 849 F.2d 1293, 1296 (10th Cir.1988)). There are three such statements alleged here.
 
 
 49
 The harmless error standard differs depending on the nature of the alleged error. A non-constitutional error is harmless unless "it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir.1990) (en banc) (citation omitted). Most constitutional errors are harmless only if we are convinced beyond a reasonable doubt that they did not affect the outcome of the trial.[5] Id. at 470; Arizona v. Fulminante, 111 S.Ct. at 1265. In analyzing whether the misconduct affected the outcome of the trial, the court considers "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." Lonedog, 929 F.2d at 572 (citing Martinez-Nava, 838 F.2d at 416). We treat all three statements alleged to constitute prosecutorial misconduct under the constitutional harmless error analysis since the statements may have deprived Harris of a fair trial.
 
 1. Prosecutor's Personal Opinion
 
 50
 The prosecutor began his rebuttal with the words, "Ladies and gentlemen, I think I'll cancel the Disney channel I have on my television set." R. 3rd Supp. Vol. XIII at 61. Defense counsel immediately objected on the grounds that the prosecutor had impermissibly injected a personal opinion into the case, but was overruled. Id. We are not convinced that mocking the defendant's theory of the case as a sheer fantasy constitutes error. Even assuming that it was error, the error was harmless since we are convinced beyond a reasonable doubt that the statement did not affect the outcome of the trial. Our review of the record reveals overwhelming evidence of Harris' guilt as indicated most forcefully by Harris' own confession.
 
 
 51
 2. Statement Two: Attacking Defense Attorneys as a Class
 
 
 52
 Almost immediately on the heels of that misstep, the prosecutor commented:
 
 
 53
 It's apparent that [defense counsel] is a very knowledgeable fellow. It's also apparent that he is a defense attorney, and defense attorneys always want to try somebody else. They don't want you thinking about their client. He even wants you to consider whether or not the Behiters or the Turpening girl is guilty of murder. Did you hear him say that?
 
 
 54
 R. 3rd Supp. Vol. XIII at 61. Defense counsel objected on the ground that he had made no such suggestion to the jury, but was overruled. We are not convinced that the prosecutor's statement constitutes error. Even assuming that it does, however, we find that the statement constitutes harmless error. Towards the end of the defense's closing argument, the prosecutor objected to defense counsel's characterization of certain testimony. The court instructed the jury, "Ladies and gentlemen, you heard the evidence. As I told you at the outset, these lawyers' closing arguments are not evidence in the case. You heard it, so I'll leave it up to you to conclude what the [witness] said on that subject. Proceed." Id. at 56-7. This warning was still fresh in the jury's mind when the statement challenged here occurred. We do not believe that the jury gave any weight to the prosecutor's statement.
 
 3. Statement Three: Inflammatory Remark
 
 55
 The final challenged statement was made immediately after the challenged statement set out in section III A.4. above. The prosecutor then stated, "[w]as he really concerned about his wife? Counsel poses that question. He just doesn't care. Bill Harris just doesn't care. Did you ever hear him say on that tape he was sorry? I'm sorry I killed those people up there in Osage County." Id. at 64. Defense counsel objected on the ground that Harris had never been asked if he was sorry. Id.
 
 
 56
 Again, we are not certain that the prosecutor's reference to what the evidence did not show constitutes error. Assuming that it was inflammatory for the prosecutor to refer to the defendant's lack of remorse, we find that the error was harmless nonetheless. As discussed above, our review of the record reveals overwhelming evidence of Harris' guilt, as indicated most forcefully by Harris' own confession.
 
 V. Restitution Order
 
 57
 Harris' final ground of error is that the district court improperly ordered Harris to pay restitution to the Cheshewallas because it failed to consider his financial resources and ability to pay. We review the factual findings underlying a district court's restitution order under a clearly erroneous standard, United States v. Rogat, 924 F.2d 983, 984-85 (10th Cir.1991), and the amount of restitution for abuse of discretion. United States v. Richard, 738 F.2d 1120, 1123 (10th Cir.1984).
 
 
 58
 Under the sentencing guidelines, the district court could have imposed a fine from $25,000 to $250,000; a monthly imprisonment cost of $91.66; a monthly cost of probation or supervised release of $1,210.05; a restitution amount of $11,690.21; and a $50 special assessment for each of the two counts of murder for which Harris was convicted. R.Vol. X at 21-22. At sentencing, the district court stated:
 
 
 59
 [T]here will be no fine imposed because you don't have any money and you couldn't pay it if there were one. There is no cost of confinement or no cost of supervised release imposed because again you don't have any money for that purpose, but the Court is going to impose restitution in the sum of $11,690.21 in hopes that from your estate or some tangible asset you may have, that that might be able to be recouped to pay into the Cheshewalla estate.
 
 
 60
 R.Vol. X at 25. Harris argues that the district court failed to take into consideration his financial resources as mandated under 18 U.S.C. § 3664(a), part of the Victim and Witness Protection Act.[6] While the sentencing judge must consider the defendant's financial condition, the judge does not need to recite specific findings regarding that condition. Rogat, 924 F.2d at 986. A defendant bears the burden of establishing his inability to make restitution under 18 U.S.C. § 3664(d).
 
 
 61
 While indigence alone is not a bar to restitution, there must be some evidence that the defendant is able to satisfy the restitution order. Id. at 985. The possibility of repayment cannot be based solely on chance. Id. The presentence report noted that "Harris described no appreciable assets or liabilities. He claimed a monthly income, prior to becoming unemployed, of $800." Presentence Report, Jan. 18, 1990 p 56. The report also stated that Harris was married, but failed to discuss to what extent, if at all, his wife relied on his income. The court found that Harris could nonetheless pay restitution "in hopes that from your estate or some tangible asset you may have" he would acquire the necessary funds. R.Vol. X at 25. From the record before us, it appears that the possibility of repayment could impermissibly be based solely on chance, and cannot stand under Rogat.[7] We vacate the order of restitution and remand solely for a determination whether there is "any evidence [that] the defendant is able to satisfy the restitution order." Rogat at 985 (citing United States v. Clark, 901 F.2d 855, 857 (10th Cir.1990)). On the record before us, it was an abuse of discretion to enter an order of restitution.
 
 
 62
 AFFIRMED IN PART, VACATED and REMANDED IN PART.
 
 
 
 *
 Honorable Aldon J. Anderson, Senior Judge, United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 We are not required to, and do not decide, whether something more is required under § 3501(b) than is required by the Due Process Clause. See, e.g., United States v. Casal, 915 F.2d 1225, 1228 n. 3 (8th Cir.1990). The government suggests that the question of voluntariness should focus only on the possible existence of police overreaching. Br. of Appellee at 11 (citing Colorado v. Connelly, 479 U.S. 157, 164 (1986)). However, as indicated above, Harris implicates both due process and § 3501 concerns and, in light of our "totality of all the surrounding circumstances" approach, we find it unnecessary to decide upon such a limitation or to apply it in this case
 
 
 [2]
 We agree with the government that § 3501(c) is inapplicable to this case since it refers only to federal, not state custody. Absent a working arrangement between federal and state officials, the section 3501 time clock does not start unless the authorities used the state custody to circumvent the requirements of § 3501. See United States v. Carter, 910 F.2d 1524, 1528 (7th Cir.1990). See also United States v. Torres, 663 F.2d 1019, 1023 (10th Cir.1981); United States v. Lepinski, 460 F.2d 234, 239 (10th Cir.1972); Hayes v. United States, 419 F.2d 1364, 1368 (10th Cir.1969) (in which this court has held that in analyzing unnecessary delay under Fed.R.Crim.P. 5(a), the time period does not start running until the accused is taken into federal custody). Here, we are unpersuaded by Harris' attempt to establish the presence of a federal state working arrangement under the facts of this case, and there is no evidence to suggest that federal authorities attempted to thwart the requirements of § 3501 by having Harris held in state custody from Friday, May 19 through Monday, May 22, 1989
 
 
 [3]
 Harris cites eight cases in his reply brief to buttress his contention that a prolonged delay between arrest and arraignment can render a proffered statement inadmissible. We do not read those cases similarly, and, in any event, all are readily distinguishable. None of the cases relied upon found a causal link between the delay and the evidence ultimately admitted at trial
 
 
 [4]
 Harris argues that the plain error standard is inappropriate because it would have been futile to raise any objections at trial. Appellant's Reply Br. at 9. In support of his position, Harris points to five occasions in the record where he objected to the prosecutor's argument and his objection was overruled. R. 3rd Supp. Vol. XIII at 30, 33, 61, 64. We are unpersuaded by Harris' attempt to evade the application of the plain error doctrine. First, Harris did not raise his initial objection until after the prosecutor made the first two challenged statements here. Counsel simply cannot sustain a claim of prejudice on a clean slate. Second, the prosecutor's objections to defense counsel's closing argument were equally unavailing. See R. 3rd Supp. Vol. XIII at 40, 50, 51. The court did not show any favoritism to one of the parties on this record
 
 
 [5]
 Some constitutional errors are never harmless. United States v. Rivera, 900 F.2d at 1470 (citing Rose v. Clark, 478 U.S. 570, 577-78 (1986))
 
 
 [6]
 That section provides: (a) The Court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of loss sustained by any victim as a result of the offense, the financial resources of the defendant, and the defendant's dependents, and such other factors as the court deems appropriate. 18 U.S.C. § 3664 (1985)
 
 
 [7]
 Our research reveals only one case where a circuit court has addressed the issue of restitution in the context of a defendant who has been sentenced to life imprisonment without the likelihood of parole. United States v. Fountain, 768 F.2d 790 (7th Cir.1985). In that case, the district court based the restitution order on the possibility that the defendants would later receive a windfall from the publication or broadcast rights of their exploits. It is doubtful that the basis for the restitution order in Fountain can survive the Court's recent pronouncement in Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd., 112 S.Ct 501 (1991)